In the Matter of WILLIAM JERRY, Petitioner, v BOARD OF EDUCATION OF THE CITY SCHOOL DISTRICT OF THE CITY OF SYRACUSE, Respondent, and LOUIS J. LEFKOWITZ, as Attorney-General of the State of New York, Intervenor-Respondent.

Fourth Department, December 12, 1975

*Bernard F. Ashe* (*Ira Paul Rubtchinsky* of counsel), for petitioner.

*Hancock, Estabrook, Ryan, Shove & Hust* (*David W. Larrison* of counsel), for respondent.

*Louis J. Lefkowitz, Attorney-General* (*Jesse J. Fine* and *Samuel A. Hirshowitz* of counsel), intervenor-respondent *pro se.*

GOLDMAN, J. In this CPLR article 78 proceeding petitioner William Jerry seeks judgment directing that respondent, Board of Education of the City School District of the City of Syracuse (Board), reinstate him to his position as a tenured teacher in the district. The proceeding was transferred here by order of Onondaga County Supreme Court, pursuant to CPLR 7804 (subd [g]).

Petitioner commenced employment as a physical education teacher in the Syracuse City School District in 1961, achieving tenure in 1964. During the 1971–1972 and 1972–1973 school years, school officials received numerous complaints that petitioner had employed physical force on elementary school pupils and had used objectionable and profane language in class. By letter dated April 19, 1973 petitioner was officially informed that the complaints were under investigation. At an executive session on May 30, 1973 the Board determined that there was probable cause for charges against petitioner. Written notices dated May 31, 1973 informed petitioner that he was charged with: (1) subjecting "certain pupils to unreasonable and excessive physical force and/or restraint" at various times during school years 1971–1972 and 1972–1973; (2) using "inappropriate and profane language in the presence of pupils" at various times during these years; and (3) insubordination for "failure to follow orders from superiors to cease and desist" the conduct charged above. These notices also apprised petitioner of his right to a hearing.

The district superintendent orally suspended petitioner on June 7, 1973 without pay and pending disposition of charges after another parent had complained that Mr. Jerry had pulled her second-grade daughter's hair around May 1, 1973 and that Jerry had used profanities while discussing the incident with her by phone. A letter dated June 7 confirmed the oral suspension. Additional formal notices of excessive

force, insubordination and profanity charges based on these subsequent allegations were prepared on June 14.

On June 19, 1973 the Board confirmed the action of the superintendent in suspending petitioner without pay. Petitioner demanded and received a bill of particulars, and also requested a hearing on the charges.[1] In accordance with the procedures prescribed by section 3020-a of the Education Law, a hearing was scheduled and a hearing officer and panel members were selected. Hearings, the record of which comprises over 2,500 pages, were held on 16 separate dates spanning nearly a year. On July 17, 1974 the three-member panel concluded that: "Insufficient evidence has been introduced to warrant dismissal of Mr. Jerry. Nevertheless, there is a preponderance of evidence to suggest that certain inappropriate behavior did occur and that such behavior deserves both reprimand and penalty and should cease during future service." The panel also made the following findings concerning the specific charges presented: (1) insubordination was not proved because "clear written or oral instructions, understandable to Mr. Jerry, were not consistently communicated to him". Nevertheless, "a generalized concern over Mr. Jerry's treatment of pupils was communicated to him, and he reasonably should have been aware of the administration's displeasure with his methods". (2) "Mr. Jerry did on several occasions use physical discipline to control students but such discipline was not excessive to the point of causing physical injury. However, many of the incidents * * * could have been avoided or minimized if Mr. Jerry used better judgment". (3) "Mr. Jerry did use inappropriate and profane language in front of students as stipulated in the charges". (4) Mr. Jerry "probably did use strong and inappropriate language" in a telephone conversation with a pupil's parent, but the incident was

1. Following the initial hearing on July 18, 1973, petitioner commenced an article 78 proceeding in which he sought to annul, on constitutional and other grounds, the Board's actions in suspending him without pay and in prosecuting the hearing. The petition was denied *(Matter of Jerry v Board of Educ. of City School Dist. of City of Syracuse,* 75 Misc 2d 461). On appeal, this court held that the part of the petition which challenged the constitutionality of section 3020-a of the Education Law was premature, improper and correctly dismissed by Special Term. However, we concluded that the section did not authorize the denial of pay to suspended teachers pending final determination of charges against them. Accordingly, we modified the judgment to require that petitioner be paid all past and future compensation due during the proceedings (44 AD2d 198). The Court of Appeals modified our order, but only to the extent of allowing earnings from other employment during petitioner's suspension to be credited against the back salary due him (35 NY2d 534).

isolated and there were extenuating circumstances. The panel recommended that petitioner be reinstated, but that he be given a formal written reprimand and penalized by the loss of three months' pay and benefits.

The Board of Education did not follow the panel's recommendation; they passed a resolution terminating petitioner's employment on August 23, 1974. The resolution recited that the Board's decision was based solely upon the hearing record and set forth the following conclusions:

"1. Mr. Jerry, despite warning by his superiors to cease, continued to use unreasonable and excessive physical force on certain of his pupils during the school years of 1971–1972 and 1972–1973 which fact is borne out by the testimony of both children directly involved in these incidents and by children who observed such incidents, as well as by the testimony of other witnesses.

"2. Mr. Jerry, despite warnings by his superiors to cease, continued to use inappropriate and profane language in the presence of pupils at various times during the school years of 1971–1972 and 1972–1973 which fact is borne out by the testimony of children who not only heard but were able to repeat the aforementioned language, as well as by the testimony of other witnesses." The resolution stated that the decision to terminate petitioner was due "especially" to "the seriousness of the charge of using unreasonable and excessive physical force".

Petitioner contends, *inter alia,* that the Board's determination was not supported by substantial evidence. In the leading case of *Matter of Stork Rest. v Boland* (282 NY 256, 273–274) the substantial evidence standard was defined in these terms: "A mere scintilla of evidence sufficient to justify a suspicion is not sufficient to support a finding upon which legal rights and obligations are based. That requires 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion' [citation omitted]". On the other hand, this court may not simply substitute its view of the facts for that of the administrative agency. Once it is ascertained that substantial evidence supports the agency's resolution of a question of fact, our inquiry on that score is ended *(Matter of Pell v Board of Educ. at Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County,* 34 NY2d 222, 230). Applying these rules to the instant case, we conclude that there was substantial evidence to support the conclusions of

fact set forth in support of the Board's resolution terminating petitioner's employment.

We first address the question whether petitioner's superiors clearly communicated to him their directions regarding his use of physical force and profane language. After incidents allegedly occurred at Levy Junior High School during the 1966–1967 school year,[2] Jerry received a memo from the superintendent of schools which summarized an oral conference between the two men as follows: "Following a number of complaints and a rather expensive lawsuit, from the School District's standpoint, I am reconfirming [your principal's] request and my own understanding that you will follow a 'hands off' policy as far as pupils are concerned, and this includes pushing and shoving in some cases as reported in letters * * * Our agreement, I believe, was that you understood this request very clearly and that there would be no further use of corporal punishment or physical force in dealing with pupils * * * in your particular case". Jerry's written response to the memo stated that he was on the same "wave length" as the superintendent.

In the spring of 1971, after a series of administrative reports and complaints (including a report that there was "strong resentment" against Jerry by students because he "allegedly uses physical restraint on students without cause"), Jerry had a conference with the assistant superintendent for personnel, his principal, and the head of physical education, all of whom told him "to keep his hands off the kids". This occurred during a period of tense racial conflict at Levy School, and among the matters discussed at the conference were alleged "incidents" involving Jerry and students. Thereafter, at the principal's request, Jerry was transferred from Levy to Cleveland and Clinton Elementary Schools for the 1971–1972 school year. The principal of Cleveland Elementary School testified that in school year 1971–1972 she received parental complaints concerning Jerry's gym classes, including a complaint that he had lifted a child up by the neck and carried him. She discussed the complaint with Jerry and

2. Incidents occurring in 1966–1967 were not alleged in the present charges against Jerry, nor could such incidents serve as cause for dismissal in light of the three-year time limit established by subdivision 8 of section 2573 of the Education Law. Even if the incidents did not occur, the fact that complaints were lodged and a conference followed is nonetheless relevant to show a course of dealings between petitioner and his superiors in which he received clear indications of the conduct that was expected of him and the kind which was disapproved.

instructed him that if it became necessary to remove physically a child from class, he should hold the child by the waist or belt and never by the neck or collar. Similar advice appeared in Jerry's "Annual Teacher Performance Appraisal Report" for 1971–1972, which also mentioned Jerry's "quick temper" in dealing with students and recommended closer contact with parents to prevent "such serious complaints as developed this year".

In academic year 1972–1973 Jerry taught at Nichols and Clinton Elementary Schools. Several parental complaints were received in December, 1972 and Jerry's physical education supervisor, Mr. Runyan, met with Jerry to discuss the complaints. According to Runyan, Jerry was then instructed that "he was not to use any profanity in the classroom, and he was not to touch any students". In February, 1973 Runyan, Jerry and Mrs. Suits, principal of Nichols, met to discuss additional complaints that Jerry had "shoved, pushed or hit" students. Again he was orally instructed "not to touch another student or to use any profanity in the classroom" and "not to throw balls at their stomachs" and do various other things of which parents and pupils had complained. All of the written complaints were shown to petitioner. Again in April, 1973 because of additional complaints discussions were had with Jerry and the prior instructions were reiterated. By letter dated April 19, 1973 the assistant superintendent for personnel informed Jerry that he would be investigated on charges that he had "used physical restraint and/or punishment on children in the Nichols Elementary School * * * [in] direct violation of orders". The letter concluded as follows: "In the meantime, the previous orders which you have received from this office, from your supervisor, and from the Superintendent of Schools, are reiterated. You are not to touch any student for any reason".

As for the use of profane language by teachers, it does not appear that the district had a written policy against it, although such language was forbidden to students by the Code of Student Behavior. The assistant superintendent testified that teachers were expected to set an example for students and that it was not "acceptable" for them to use profanity in the presence of students. Moreover, as already noted, Jerry was explicitly told not to use profanity in class. In light of the many written and oral communications between Jerry and school officials, and the context in which those communications took place, Jerry undoubtedly knew that his use of

profanity and physical force was disapproved and that he was expected to change his conduct.

Having concluded that Jerry received clear instructions from his superiors, we turn to the evidence that he violated those instructions. Much of the hearing testimony concerning the use of physical force by petitioner came from school children. Only children whose parents gave permission testified, and the hearing officer examined each child witness beforehand to determine his competence to testify. No fewer than 20 incidents during the 1971–1972 and 1972–1973 school years were recounted by second through fifth grade pupils who claimed to have received physical punishment at the hands of petitioner. The same and other incidents were reported by children who said that they had been eyewitnesses to petitioner's conduct. Among the acts described were the striking of children with dodge balls, soccer balls, hands and fists, the throwing or pushing of children against walls and floors so as to cause them to strike their heads and knees, the pulling of hair, the lifting up and carrying of children by the neck, and the pulling of a child by the ear. Some children cried and shook with fear and sought permission to stay in their homeroom.

On this record the Board could and did rationally conclude that petitioner used "unreasonable and excessive physical force" on his students. The hearing panel's finding that "such discipline was not excessive to the point of causing physical injury" does not compel a different result. The respondent Board is bound by the evidence produced at the hearing but not by the findings and recommendations of the panel (CPLR 7803, subd 4; 8 NYCRR 82.11; *Matter of Caravello v Board of Educ., Norwich City School Dist., Chenango County,* 48 AD2d 967, 968). Moreover, the panel's conclusion suggests that a teacher uses "unreasonable or excessive physical force" only when he physically injures his students. The "hands off" instructions to Jerry clearly required more from him than merely refraining from injuring his students. Physical education in elementary school should fairly involve more than having students of such tender age leave the gymnasium with their bodily health intact. Thus the Board within the realm of fairness and rational education policy could conclude that Jerry had used "unreasonable and excessive force" (cf. *Matter of Smart v Francis,* 35 NY2d 872, revg 43 AD2d 623).

Similarly, we conclude that substantial evidence supported

the Board's finding that Jerry used "inappropriate and profane language in the presence of pupils". Third, fourth, and fifth graders testified that he used a variety of terms, some of them in reference to students, including "dummies", "damn babies", "big babies", "stupid", "bastards", "little shit heads", "the f-word", "Jesus Christ", "bitch". Jerry admitted referring to students as "babies" and "dummies" to stimulate them; he conceded that "once in a while" he said "hell" and that he may have said "Jesus Christ" "a few times", but he did not consider those terms profanities. There was more than sufficient support in the record for the Board's conclusion that Jerry used profane and inappropriate language.

Our next inquiry is whether the Board abused its discretion in imposing the penalty of dismissal upon petitioner (CPLR 7803, subd 3). In *Matter of Pell v Board of Educ.* (34 NY2d 222, *supra)* a unanimous Court of Appeals restated the principles applicable in judicial review of administrative determinations imposing disciplinary penalties on public employees. Where substantial evidence supports the finding that the petitioner is guilty of the charge, a reviewing court will not set aside the punishment unless "such punishment is ' " 'so disproportionate to the offense, in light of all the circumstances, as to be shocking to one's sense of fairness' " ' [citations omitted]" (34 NY2d 222, 233, *supra).* In explaining that standard the court stated: "[I]t may be ventured that a result is shocking to one's sense of fairness if the sanction imposed is so grave in its impact on the individual subjected to it that it is disproportionate to the misconduct, incompetence, failure or turpitude of the individual, or to the harm or risk of harm to the agency or institution, or to the public generally visited or threatened by the derelictions of the individual" (34 NY2d 222, 234, *supra).* That the penalty of dismissal has a grave impact on petitioner is obvious. But, by his actions he manifested a disregard for the Board's right and duty to make and enforce policies fostering the physical, emotional and educational well-being of students, the goodwill and confidence of their parents, and the orderly administration of schools. Nor was petitioner's misconduct limited to a single isolated instance (cf. *Matter of Donahue,* 12 Ed Dept Rep 104); rather it was a persistent course of conduct in defiance of clear and repeated warnings. In these circumstances, we cannot say that the penalty was disproportionate to the offenses (see *Matter of Smart v Francis,* 35 NY2d 872, *supra; Matter of Whittington v*

*Porcari,* 35 NY2d 839, revg 41 AD2d 1023; *Matter of Pell v Board of Educ.,* 34 NY2d 222, *supra; Matter of Caravello v Board of Educ.,* 48 AD2d 967, *supra; Matter of Kelly,* 13 Ed Dept Rep 122; *Matter of Donnenburg,* 1 Ed Dept Rep 42; *Matter of McCann,* 70 NY St Dept Rep 85).

Petitioner contends that the proceedings were affected by errors of law which require a new hearing. The first of these contentions is that petitioner was not given sufficient notice of the charges against him. He notes that subdivision 2 of section 3020-a of the Education Law requires that "a written statement specifying the charges in detail" be mailed to the teacher. Although the notices did not name the pupils affected and did not fix the exact dates of the occurrences, they did specify the schools and years in which the incidents occurred and the nature of the misconduct alleged. Moreover, a bill of particulars, which was served promptly after demand, supplied the names of individual pupils, specified how each was allegedly mistreated, and gave exact or approximate dates when possible. The written notice of charges, as amplified by the bill of particulars, satisfied the specificity requirement of subdivision 2 of section 3020-a of the Education Law. (See *Matter of Caravello v Board of Educ.,* 48 AD2d 967, 968–969, *supra.)* The charges were "sufficiently clear to apprise petitioner of the reasons for the hearing and to prepare a defense" *(Matter of Grzywacz,* 11 Ed Dept Rep 187, 189). *Matter of Soucy v Board of Educ. of North Colonie Cent. School Dist. No. 5* (41 AD2d 984) is distinguishable, for there the hearing panel expressly based its finding of teacher incompetency on acts of incompetence not alleged in the charges.

Petitioner also asserts that certain evidentiary rulings by the hearing officer were erroneous and so prejudicial as to require a new hearing. In particular, he questions the admission of the testimony of children. The record reveals that the hearing officer carefully examined each child to test his competence, found him qualified, and administered the oath. The testimony of the children would thus have been admissible upon the trial of a civil action (cf. *Matter of Brown v Ristich,* 36 NY2d 183, 189; *Jensen v Shady Pines,* 32 AD2d 648; see 65 NY Jur, Witnesses, § 19, pp 165–167), and the standard here should not be stricter. Moreover, petitioner's attorney had full opportunity to cross-examine all of the children, except one, who apparently became upset and had to leave the stand, and as to that child's testimony counsel did not object.

Similarly, it was not error to admit evidence concerning incidents that occurred more than three years prior to the bringing of the charges. Subdivision 8 of section 2573 of the Education Law was not violated, since the charges were not based on those incidents. These items of evidence were not offered to prove that the earlier incidents occurred; rather they were offered to demonstrate that petitioner had notice that he was not to use physical force on students. For that purpose the challenged items were clearly relevant. Even if these details should have been excluded, their admission was not reversible error. The hearing was not required to comport with "technical rules of evidence" (Education Law, § 3020-a, subd 3, par c). Its aim was to assemble "all relevant, material and reliable evidence which will contribute to an informed result" (*Matter of Sowa v Looney,* 23 NY2d 329, 333), and evidence technically inadmissible, irrelevant, or even in some degree prejudicial will not require reversal unless its admission violates the fundamentals of a fair hearing (*Matter of Sowa v Looney,* 23 NY2d 329, 334–335, *supra;* cf. *Matter of Schadt v Sardino,* 48 AD2d 171, 174). Here the school district's counsel was careful not to magnify the significance of the earlier incidents, as evidenced by the fact that he did not elicit direct testimony concerning their details. The testimony was kept within the bounds of the offer of proof of notice. Moreover, the Board's resolution makes clear that the determination was based on incidents occurring in the 1971–1972 and 1972–1973 school years, and not on prior incidents. Like considerations compel rejection of petitioner's other challenges to evidentiary rulings.

Petitioner next argues that his suspension without a prior hearing deprived him of due process of law. When this matter was before us on the prior occasion (44 AD2d 198, *supra),* we held that a tenured teacher may not be suspended without pay pending a hearing, basing our conclusion on constitutional as well as statutory grounds. We acknowledged that "a tenured teacher has a constitutionally protected property interest" (44 AD2d 198, 203, *supra,* citing *Slochower v Board of Educ.,* 350 US 551), but concluded that "the nature of the charges against petitioner * * * (physical restraint and punishment * * * )" justified his suspension prior to a hearing (44 AD2d 198, 204, *supra).* On appeal, the Court of Appeals concluded that section 3020-a of the Education Law did not permit withholding of pay during suspension, but stated: "All

of the members of the court are of the view that suspension of a tenured teacher without pay pending the final determination of section 3020-a disciplinary proceedings, provided such determination is not unreasonably delayed, would involve no infringement of the teacher's constitutional rights *(Sanford v. Rockefeller,* 35 N Y 2d 547; *Arnett v. Kennedy,* 416 U.S. 134; cf. *Mitchell v. Grant Co.,* 416 U.S. 600; *Pordum v. Board of Regents of State of N. Y.,* 491 F.2d 1281, cert. den. 419 U.S. 843)." (35 NY2d 534, 541, *supra.)* That conclusion should apply a fortiori where, as here, the teacher is paid during the suspension period. Although a 14-month delay intervened between the suspension and the dismissal, much of that delay was caused by petitioner himself. He obtained several adjournments and a court order staying the hearing for 2½ months. Only three weeks of the delay were due to the adoption of regulations by the Commissioner of Education to cure a defect in the procedures. In these circumstances, we do not deem the delay unreasonable.

Petitioner urges that the applicable constitutional law has been altered by *Goss v Lopez* (419 US 565), where it was held that due process requires a public high school student, prior to a nonappealable suspension of 10 days or less, to be given notice of the charges against him and an opportunity to rebut them. The *Goss* case is clearly distinguishable. Unlike the students in *Goss,* who had no appeal of any kind, petitioner here was assured of a hearing if he desired one and the other procedural protections of section 3020-a of the Education Law. These statutory safeguards provide an impetus to informed and reasoned decision that was absent in the summary suspension of students in *Goss.* Moreover, even if *Goss* were applicable here, the result would be the same. Petitioner and his union representative were summoned to the superintendent's office at the time he was informed of the suspension decision, and they were presented with the facts upon which suspension was based and allowed to give Jerry's version of the facts. These factors satisfy the flexible, informal requirements outlined in *Goss* (419 US 565, *supra).*

Petitioner further claims that the hearing procedures prescribed by section 3020-a of the Education Law violate the due process clause of the Fourteenth Amendment. In 1974 a three-Judge Federal District Court declared the section unconstitutional and enjoined its enforcement pending adoption of administrative regulations to cure specified defects *(Kinsella v*

*Board of Educ. of Cent. School Dist. No. 7 of Towns of Amherst and Tonawanda, Erie County,* 378 F Supp 54, 60). In our prior decision in this matter we acknowledged the *Kinsella* case and noted that the Commissioner of Education had adopted regulations which cured the defects (44 AD2d 198, 206, *supra).* Petitioner does not dispute that the regulations (8 NYCRR 82.10 [h], 82.11), if valid, meet the *Kinsella* objections. However, he urges that they are void because they were promulgated in excess of the authority of the Department of Education. The identical argument was examined at length and rejected in *Hodgkins v Central School Dist. No. 1 of Towns of Conklin, Binghamton, Kirkwood and Vestal* (48 AD2d 302, affg 78 Misc 2d 91). We likewise reject it.

Aside from the now-cured *Kinsella* objections, petitioner contends that section 3020-a denies due process because "the hearing provided for therein does not take place before the ultimate and/or actual decision maker". In proceedings as formal as those required by section 3020-a, the requirements of due process are satisfied if the ultimate decision maker considers and bases his determination on the legally produced evidence *(Matter of Varian v Commissioner of Internal Revenue,* 396 F2d 753, 754–755, cert den 393 US 962; cf. *Morgan v United States,* 298 US 468, 479–482). The requirement that the decision of the Board of Education be based "solely on the record in the proceedings before the hearing panel" (8 NYCRR 82.11) was fully observed by the Board in making its determination.

Finally, petitioner argues that section 3020-a violates due process because it requires the Board of Education to combine the investigative and decision-making functions. Combination of such functions is common in administrative law *(Matter of Buffalo Teachers' Foundation v Helsby,* 35 AD2d 318, 322), and does not violate an employee's due process rights in dealings with his employer "absent a showing of actual, rather than potential, bias" *(Simard v Board of Educ. of Town of Groton,* 473 F2d 988, 993; *Swab v Cedar Rapids Community School Dist.,* 494 F2d 353; cf. *Withrow v Larkin,* 421 US 35). The present record is devoid of evidence that the members of the Board were biased against petitioner.

The petition should be dismissed.

MARSH, P. J., SIMONS, MAHONEY and DEL VECCHIO, JJ., concur.

Determination unanimously confirmed, without costs and petition dismissed.