**CITY OF CEDAR RAPIDS, Iowa, Appellant,**

v.

**MUNICIPAL FIRE AND POLICE RETIREMENT SYSTEM OF IOWA, Appellee,**

and

**Frank D. Gardner, Intervenor–Appellee.**

No. 93–1760.

Supreme Court of Iowa.

Jan. 18, 1995.

James H. Flitz, City Attorney's Office, Cedar Rapids, for appellant.

Alice E. Helle and James H. Gilliam of Brown, Winick, Graves, Donnelly, Baskerville, and Schoenebaum, Des Moines, for appellee.

Robert F. Wilson, Cedar Rapids, for intervenor-appellee.

Considered by CARTER, P.J., and LAVORATO, NEUMAN, SNELL, and TERNUS, JJ.

LAVORATO, Justice.

The Municipal Fire and Police Retirement System of Iowa (System) awarded Frank D. Gardner, a firefighter, accidental disability benefits. The City of Cedar Rapids (City), Gardner's employer, appealed to the district court via certiorari, raising two issues. First, the City contended there was no substantial evidence that Gardner's disability resulted from an injury or disease as defined in Iowa Code section 411.6(5) (1991). Second, the City contended that it was denied procedural due process because it received no notice and had no opportunity to be heard before the entity that made the final decision.

The district court concluded there was substantial evidence that "Gardner is totally and permanently incapacitated to perform his duties as a firefighter and that this incapacity is the natural and proximate result of injuries incurred in and aggravated by the performance of his duties." The court also concluded that the City received all of the due process it was entitled to. We agree and affirm the district court's order dismissing the City's petition for a writ of certiorari.

I. *Background Facts and Proceedings.*

Gardner began his employment with the Cedar Rapids fire department in June 1964. At the time of the facts giving rise to this appeal, his title was administrative district chief. His primary responsibility was training firefighters.

An employee health record reveals that on February 3, 1978, Gardner fell, striking the middle of his back on a step. He did not consult a doctor after this mishap and could

not remember it when asked about it at the disability evidentiary hearing.

On September 14, 1980, Gardner pulled a hose at a fire, straining the lower right side of his back. He did not miss any work as a result of that injury. About five weeks later, Gardner again strained his back by pulling a hose up the side of a drill tower. This last injury caused Gardner to miss about four and one-half months of work.

While conducting a training exercise on August 21, 1984, Gardner strained his lower left back. He missed no work from this injury and for the next seven years he missed no work because of back problems. He did, however, continue to seek treatment for his back.

In 1991 Gardner began experiencing severe back pain. He went to his doctor, who referred him to Dr. David P. Hart, an orthopedic surgeon. Dr. Hart conducted several tests, including an MRI. He concluded that Gardner was suffering from "degenerative disk disease L5–S1 with probable spinal stenosis." Gardner followed Dr. Hart's treatment recommendations, but he got no relief.

Dr. Hart then referred Gardner to Dr. Chad D. Abernathey, a neurosurgeon. Dr. Abernathey reviewed the MRI and concluded that it revealed "a small disc protrusion at the L5–S1 interspace with mild projection to the left." So that Dr. Abernathey could make a more complete diagnosis, he recommended that Gardner undergo a CT myelogram. Fearing that the test would be painful, Gardner refused it. On the basis of the information Dr. Abernathey did have, he concluded that Gardner suffered from chronic pain syndrome. In his patient notes, Dr. Abernathey said Gardner's condition possibly was caused in part by the disc bulge, but this was minimal considering the number of years Gardner had experienced back problems.

Gardner's last day of work was December 3, 1991. In January 1992 Gardner applied for accidental disability benefits from the Board of Trustees of the Municipal Fire and Police Retirement System of Iowa (Board). The Board procedures required that Gardner undergo evaluation by a three doctor medical board at the University of Iowa Hospitals.

Although their diagnoses were cast in slightly different medical terminology, each ultimately certified that Gardner suffered from degenerative disc disease. In the opinion of one doctor, Gardner "is totally disabled related to his current job."

Pursuant to the Board's procedure, the director of the Board approved Gardner's application for accidental disability benefits. The City appealed from the director's approval to the Disability Appeals Committee.

Following an evidentiary hearing, the Disability Appeals Committee made up of three Board members concluded that

> Gardner has established that he meets the requirements of section 411.6(5) for accidental disability benefits. Despite the City's argument that Gardner suffers from degenerative disc disease, there is substantial evidence that his condition was precipitated by the documented on-the-job injuries. The fact that his complete inability to perform did not immediately follow the injuries in question does not preclude entitlement under the statute.

The Disability Appeals Committee then awarded Gardner accidental disability benefits.

Later the full Board entered an order adopting the Disability Appeals Committee's proposed findings of fact and conclusions of law as the decision of the System.

The City appealed this order to the district court by way of certiorari. Gardner intervened in the appeal.

After a hearing, the district court sustained the Board's order and dismissed the petition.

II. *Scope of Review.*

■ Iowa Code chapter 411—Retirement Systems for Police Officers and Firefighters—does not contain any appeal provisions. But a party receiving an adverse decision from the Board may seek judicial review of the Board's decision by filing a petition for a writ of certiorari. *Benson v. Fort Dodge Police Pension Bd.*, 312 N.W.2d 548, 550 (Iowa 1981).

Certiorari actions are proper when an inferior board, exercising judicial functions, acts illegally. Iowa R.Civ.P. 306. An inferior board acts illegally if it has not acted in accordance with a statute or if its decision was not supported by substantial evidence. *Norland v. Worth County Compensation Bd.*, 323 N.W.2d 251, 253 (Iowa 1982). Evidence is substantial "when a reasonable mind could accept it as adequate to reach the same findings." *Norland v. Iowa Dep't of Job Serv.*, 412 N.W.2d 904, 913 (Iowa 1987) (citation omitted). Evidence is still substantial even though it would have supported contrary inferences. *Id.*

## III. *Substantial Evidence.*

The City contends that Gardner is disabled because of pain that has developed and progressed slowly over a long period of time. The City thinks there is uncontroverted medical evidence that this pain results from a chronic condition known as degenerative disc disease. State law permits accidental disability retirement because of disease, but only if the disease is of the heart, lung, or respiratory tract. Iowa Code § 411.6(5).

Because Gardner's degenerative disc disease is not one of these, the City insists that he is not entitled to accidental disability retirement benefits. So, the City concludes, the district court erred by upholding the System's award of accidental disability retirement benefits. Rather, the City says, Gardner is only entitled to ordinary disability retirement benefits.

Accidental disability retirement affords greater benefits than ordinary disability retirement. So the basis of Gardner's retirement is significant.

Iowa Code section 411.6(5) provides in pertinent part that any police officer or firefighter

who has become totally and permanently incapacitated for duty as the natural and proximate result of an injury or disease incurred in or aggravated by the actual performance of duty at some definite time and place, ... shall be retired by the respective board of trustees, provided, that the medical board shall certify that [the police officer or firefighter] is mentally or physically incapacitated for further performance of duty, that such incapacity is likely to be permanent and that [the police officer or firefighter] should be retired.

. . . .

Disease under this section shall mean heart disease or any disease of the lungs or respiratory tract and shall be presumed to have been contracted while on active duty as a result of strain or the inhalation of noxious fumes, poison, or gases.

Disease as defined in this section is exclusive, meaning that the legislature has limited the meaning of disease to diseases that come within the statutory definition of the term. *Benson*, 312 N.W.2d at 551. There is no contention nor showing that Gardner suffers from any of these diseases.

So that limits our review to whether there is substantial record evidence that Gardner (1) suffers from injury or disease "incurred in or aggravated by the actual performance of duty at some definite time and place," and (2) is "totally and permanently incapacitated for duty as the natural and proximate result" of such injury or disease. Iowa Code § 411.6(5).

As to the first requirement, all three medical board doctors—Hunninghake, Schwartz, and Aksamit—pinpoint Gardner's disability to the 1984 incident in which he strained his back while lifting a heavy object during a training exercise. So there is substantial record evidence of an injury—strained back—that occurred in the actual performance of duty at a definite time and place.

The three doctors also agree that the degenerative disc disease totally and permanently incapacitated Gardner from duty.

That brings us to the City's contention: Because Gardner suffers from a disease rather than an injury, he is not entitled to accidental injury retirement benefits. The City's contention focuses on whether Gardner suffered an injury *or* a disease. We think this is the wrong focus. The focus should be on whether there is a reasonable connection between the 1984 back injury and the degenerative disc disease disability.

■ The words "natural" and "proximate" provide this reasonable connection. Neither is defined in the statute. But they are familiar words in the law and refer to the concept of proximate cause in tort law. "Natural" refers to

> consequences which are normal, not extraordinary, not surprising in the light of ordinary experience.... The phrase therefore appears to come out as the equivalent of the test of foreseeability, of consequences within the scope of the original risk, so that the likelihood of their occurrence was a factor in making the defendant negligent in the first instance.

W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* § 43, at 282 (5th ed. 1984).

"Proximate cause" itself is defined this way:

> The conduct of a party is a proximate cause of damage when it is a substantial factor in producing damage and when the damage would not have happened except for the conduct.

> "Substantial" means the party's conduct has such an effect in producing damage as to lead a reasonable person to regard it as a cause.

1 Iowa Civil Jury Instructions 700.3 (1991).

We can tailor the definitions of natural and proximate cause to the statute. In doing so, we conclude the statute is met when it is established that (1) the 1984 back injury is a substantial factor in producing the degenerative disc disease disability, (2) the disability would not have happened except for this injury; and (3) the disability was a normal consequence of the injury. In addition "substantial" here means that the injury had such an effect in producing the degenerative disc disease disability as to lead a reasonable person to regard the 1984 back injury as a cause of this disability. We think the following excerpts from Dr. Hunninghake's deposition testimony amply provide substantial record evidence to establish this reasonable connection:

> Q. And you had a consultation with Mr. Gardner, did you not? A. I examined him in the clinic.

> Q. Tell me what that consisted of. A. Well, I first reviewed all the documents that we were provided. The second is I took a history from Mr. Gardner, complete history, and then I did a complete physical examination on him. And he was—came with a lot of tests, so there really wasn't any tests we really needed to work on.

> ....

> Q. And what was your conclusion then? A. Well, our conclusion was that the information that we were provided, and I mean information in its entirety, was consistent with an injury related to his occupation as a firefighter; and secondly, that he had been evaluated by a competent orthopedic surgeon who felt that this shouldn't be operated on. Thirdly, he had received appropriate medical therapy for his back. And in spite of all that, he was still having substantial symptoms related to exertion at his work. And they were substantial symptoms with pain radiating down his buttocks and into his legs and a significant amount of restriction of motion of his back. And clearly—it seemed to us that clearly his work was continuing to exacerbate this condition in a very substantial way; and in fact, he probably wasn't able to do all the things that would be required of a firefighter. And based on that information, we felt that he was disabled.

> Q. Let's talk about when Mr. Gardner came to you, he was suffering from a condition; is that correct? A. Yes.

> Q. And what would that condition be? A. Well, I gave him the diagnosis of degenerative disc disease with a narrow disc space at L5–S1 and increased sclerosis at the L5–S1 facets and a possible herniated disc.

> Q. Can you tell me what degenerative disc disease is? Is there a way to describe that? A. Probably in lay terms, the best way to describe it is arthritis due to trauma in the back which results in impingement of nerves that exit from the spinal cord.

> ....

> Q. One of the issues in this case is whether Mr. Gardner is suffering from an injury or a disease. And I'm trying to

get—A. It was our—it was my impression based on—I see what you're asking now. It was my impression based on the data that we were provided that this condition or disease, whatever you want to call it, was related to his occupation.

Q. Okay. A. Therefore, would be an injury.

Q. Did this injury occur at a definite time and place, to your understanding, according to—A. My understanding was that there was at least one defined acute injury that was most noticeable; and then subsequent to that, that there were potentially repeated injuries subsequent to that.

Q. Can you tell me about that one incident, the information you have? A. It's basically the information that we were provided here. I'd have to look. Maybe I have it summarized in my letter. It says in 1984 while performing—this is from reading from my letter—1984 while performing a training exercise on his job, he lifted a very heavy object and, quote, hurt his back.

. . . .

Q. Can you explain to me how medically that incident, the facts of which you just reviewed in that incident report of 1984, could have led to this condition that is described in your letter of the degenerative disc disease, can you tell me anatomically or medically how the two are related? A. [T]here's two potential things that can happen, and one of the most important is that if you—there's a cushion between the vertebrae; and if that cushion loses its integrity, two different things happen. One is the disc space narrows, the distance between two vertebrae; and secondly, you get a lot of sclerosis around the bone. And the result of those two things is to impinge on nerves.

Q. So it is sort of like—A. Think about it as shock absorbers on your car, these cushions between bones as shock absorbers on your car. They're designed to withstand a certain amount of sudden insults. But those can be exceeded. And there's also, if you—the harder, the more acutely you traumatize this, the faster they're going to wear out. I'm trying to

put it in as lay as terms as I can. But a single acute injury by itself can cause what's called a herniation of that cushion between two vertebrae. That's also a very common event.

Q. Regarding Mr. Gardner, do you think that in 1984 you had a single incident like that, or was that—or do you think it's more of the type of a repetitive situation? A. Well, I don't think I could comment on what happened before 1984 because I don't have any information prior to 1984. I think the history that I obtained from his incident report, from Mr. Gardner himself, from the orthopedic surgeon, and all the other physicians who saw him are consistent with an acute sudden injury in 1984 and frequent exacerbations of that injury subsequent to that.

. . . .

Q. Or what about in light of the fact that in 1980 he had a prior injury involving his back with—I think he missed quite a bit of work with? A. I don't know that that necessarily would have changed my opinion if it was an injury at work. But I think, it seems to me, that whether you throw that in or not, that there is the well-defined insult in 1984 from which he has not fully recovered in spite of adequate surgical consultation and medical evaluation and treatment.

Q. Between 1984 and I think sometime in 1991, I think the records will indicate that Mr. Gardner did not miss any work due to any type of back-related complaints. Were you aware of that history? That would not change your opinion, or that was factored into your opinion? A. Yeah, I mean, I interpret that to mean that he was a fairly conscientious firefighter. And also I think that there were people compensating for him at work, people who would do heavy work for him that he really should be doing. I think that was—that's the history that I got from Mr. Gardner. I asked him that question fairly directly. And basically, he had a lot of buddies who would help him out; and then when they couldn't help him out and he would actually do it, then he would end up with a bad back for a prolonged period of time. And

if it was heavy lifting, he would have pain going down his legs. And I thought that was a very important part of the history.

Q. Now, you concluded and I think your letter indicates he is totally disabled related to his current job, and you analyzed that in terms of his job as a firefighter? A. Right.

. . . .

Q. Starting with the injury that was made known to you in 1984, after which Mr. Gardner continued to work and didn't miss any work until sometime in either 1991 or 1992, what has happened medically or physically to make that situation where he can no longer function where he had been for six or seven years? A. I think that would be a pretty common outcome of somebody who continued to have insults after an injury like this. What would happen is that there's—the vertebrae are going to develop basically more arthritis, and the joint spaces are going to continue to narrow. And that's going to lead to more spasm of muscles in the back and greater impingement on nerves.

Q. So this is a situation which progresses then over time related to the number of these incidences? A. Yeah, and I would say the fact that he continued to work may have been one of the factors that continued to aggravate the situation. And I think you know the history that I was provided was that, you know, each time, particularly in recent years, that he would lift something heavy or have to strain himself is when he would develop acute increases in spasm and at times this radicular pain.

. . . .

Q. Do you have an opinion whether or not the condition that you concluded Mr. Gardner has is permanent or not? A. Oh, I doubt this likely to—I think that the condition is permanent.

Q. The condition in his back, the way these spaces have narrowed—A. The anatomical changes in his back will not improve. I'm quite sure of that.

We think the fact finder could reasonably interpret this testimony this way. Gardner suffered a back injury in 1984 in the perfor-

mance of his duties. This back injury was a substantial factor in precipitating the degenerative disc disease. And without this acute back injury and repeated aggravations of this injury from work duties, the degenerative disc disease would probably not have been disabling. This chain of events is a natural progression from the 1984 back injury. This is so because degenerative disc disease with accompanying disability resulting from a back injury and repeated aggravations of that injury is not surprising in light of medical experience.

So we conclude there is substantial record evidence from the medical board doctors that Gardner (1) suffers from an injury incurred in or aggravated by the actual performance of duty at some definite time and place, and (2) is totally and permanently incapacitated for duty as a natural and proximate result of such injury. The district court was correct in reaching the same conclusion and upholding the Board's order awarding Gardner accidental disability retirement benefits.

## IV. *Due Process.*

■ The Board has established an elaborate administrative process to determine disability issues before the parties resort to a certiorari action in the district court. A hearing requirement is set forth in this process. The entire process is covered in rules promulgated by the Board pursuant to its statutory authority. *See* Iowa Code §§ 411.5(1) and (4).

To put the City's procedural due process challenge in perspective, we summarize those rules. To initiate the disability determination process, an applicant must file an application for disability benefits with the System in Des Moines. Rules 9.1, 9.2(1). The applicant must (1) identify all medical conditions the applicant claims to be disabling, (2) submit all available medical information pertaining to the applicant's alleged disability, and (3) describe the time, place, and particulars of any claimed job-related injuries. The City is likewise required to submit similar information it has available. Rules 9.2(3), 9.2(4).

The medical board must then review all this information and arrange for a medical

examination of the applicant. Rule 9.3(2)(a) and (b). Following this review and examination, the medical board must submit to the System a written report containing its conclusions, recommendations, and assessment of the applicant's claim. Rule 9.3(2)(d).

Following receipt of this report, the director of the System is required to review it and make a written determination either approving or denying benefits. This written determination must also specify whether ordinary or accidental disability benefits are to be paid. Rule 9.3(2)(e). The System must then notify the applicant and the City of its determination in writing within ninety days of the application date. Rule 9.3(1)(f) and (i).

At this point the appeal process is triggered. Any adversely affected party may ask for a hearing within thirty days of the date of this notice. Rule 9.4(1)(a).

If a hearing is requested, the Board's chair appoints a three-member committee made up of Board members. The committee is called the Disability Appeals Committee. Rule 9.4(2)(a).

The hearing is a quasi-judicial proceeding, held after notice to the parties. Rule 9.4(3)(a). The rules set forth the following hearing procedures:

. . . .

e. The hearing shall be conducted as informally as is compatible with due process.

f. The hearing shall be reported either mechanically or by a certified court reporter.

g. The following persons are entitled to appear before the committee in connection with any disability hearing:

(1) The affected member and/or beneficiaries, and their designated representatives, if any;

(2) Attorneys admitted to practice in Iowa appearing on behalf of affected members or beneficiaries;

(3) Officials of the employing city;

(4) Authorized union representatives;

(5) Examining physicians;

(6) Occurrence witnesses, if a dispute of fact exists;

(7) Any other relevant witnesses.

h. Unless otherwise directed by the committee chair, evidence will be received in the following order:

(1) Opening statements;

(2) Appellant's evidence and testimony;

(3) City's evidence and testimony (if any);

(4) Report of medical examination, any other medical evidence not already received, and recommendation by the medical board;

(5) Rebuttal evidence;

(6) Closing arguments.

Rule 9.4(3)(e–h).

Following the hearing, the parties have seven days to file posttrial briefs. Rule 9.4(3)(i). The Disability Appeals Committee must render a written hearing decision within thirty days of the deadline for posttrial briefs. The decision must set forth the Disability Appeals Committee's findings of fact and conclusions of law. Rule 9.4(3)(k).

Rule 9.4(3)(k) also provides that the Disability Appeals Committee's decision "shall be ratified by the Board of Trustees on consent motions at the next regularly scheduled Board meeting." It is at this stage that the City complains it was denied procedural due process. The City complains because the Disability Appeals Committee's decision was presented to the full Board for ratification without notice to the City and without an opportunity to be heard by the Board before its final decision. In short, the City says it had no meaningful opportunity to be heard by the ultimate decision maker—the Board— before the Board's decision was reached. So, the City concludes, it was denied procedural due process.

■ Procedural due process requires, at a minimum, notice and an opportunity to be heard in a proceeding that is "adequate to safeguard the right for which the constitutional protection is invoked." *Anderson Nat'l Bank v. Luckett*, 321 U.S. 233, 246, 64 S.Ct. 599, 606, 88 L.Ed. 692, 705 (1944). What the City is really contending is that its procedural due process rights were violated because the hearing provided by the rules

did not take place before the ultimate decision maker. The City is not contending that the hearing it did have was inadequate for procedural due process purposes.

Whether procedural due process requires a hearing before the ultimate decision maker was first decided in the context of an administrative proceeding almost sixty years ago. *See Morgan v. United States*, 298 U.S. 468, 56 S.Ct. 906, 80 L.Ed. 1288 (1936). One noted commentator discusses what *Morgan* requires to satisfy procedural due process on this issue:

> According to the opinion in the leading First Morgan case, the requirement is not that deciding officers must personally read the record but it is that they must personally "consider and appraise" the evidence. The Court declared: "Evidence may be taken by an examiner. Evidence thus taken may be sifted and analyzed by competent subordinates." Since the only purpose of sifting and analyzing of evidence by subordinates is to save the time of the deciding officers, this necessarily means that deciding officers may "consider and appraise" the evidence by reading a summary or analysis prepared by subordinates. The Supreme Court thus did not require in the First Morgan case that deciding officers must read all the evidence or even that they must directly read any of it. *The requirement has to do with personal understanding of the evidence, not with the mechanics by which the understanding is developed.* In common practice, deciding officers develop their understanding of evidence not only through reports of subordinates but especially through summaries and explanations in briefs and oral arguments of parties.

2 Kenneth Culp Davis, *Administrative Law* § 11.03, at 44–45 (1958) [hereinafter *Administrative Law*] (footnotes omitted) (emphasis added).

In a sixth circuit federal court decision, we see a modern day application of the *Morgan* principles. *See Bates v. Sponberg*, 547 F.2d 325 (6th Cir.1976). There, a tenured professor made a constitutionally based challenge to his dismissal. A hearing before the Faculty Senate Grievance Committee was held on charges brought against the professor. Following the hearing, the Grievance Committee prepared a report containing factual findings and a statement that an adequate cause for dismissal was shown.

The Grievance Committee submitted the report to the defendant—the university president—who in turn prepared and submitted to the Board of Regents a report recommending the professor's dismissal. The Board of Regents denied the professor's request for hearing and dismissed the professor on the basis of the Grievance Committee's and president's reports. In reaching its decision, the Board of Regents did not read a transcript of the Grievance Committee hearing.

The professor alleged the Board of Regents violated his procedural due process rights when it failed to review the record made before the Grievance Committee. The appellate court disagreed:

> We think the crux of the issue, in terms of due process under the Fourteenth Amendment, is not whether the due process hearing to which [the professor] may have been entitled was held in the presence of the authority having final responsibility to determine his discharge, but instead whether the hearing accorded him was meaningful.

*Bates*, 547 F.2d at 332. Agreeing with Davis' interpretation of *Morgan*, an interpretation we quoted earlier, the appellate court held *Morgan* did not require that the deciding officer must personally read the record. It only required that deciding officers must personally "consider and appraise" the evidence. *Id.*

Applying *Morgan* to the facts before it, the appellate court concluded:

> Measured by the standards of *Morgan*, as we interpret them, the Board of Regents' consideration and action upon the report of the Grievance Committee met the minimal requirements of due process. Nothing in the record here nor in the district judge's opinion suggests that the Grievance Committee's report was deficient, contained factual inaccuracies or did not fairly summarize the evidence before it. [The professor] was discharged because he refused to submit the required report, a fact which

was never in dispute and which was even admitted specifically by him at the time he demanded his hearing. We think that the reports by the [Grievance C]ommittee and [the president] provided a sufficient basis for the Board of Regents to acquire a "personal understanding" of the evidence supporting the charges against [the professor].

*Id.* at 333. *Compare Keith v. San Bernardino County Retirement Bd.,* 222 Cal.App.3d 411, 412–13, 271 Cal.Rptr. 649, 650–51 (1990) (no procedural due process violation where one hearing officer heard evidence on county employee's application for nonservice-connected disability benefits and another hearing officer issued proposed decision; employee received opportunity to be heard and county retirement board's final decision was based upon independent review of all evidence); *Pet v. Department of Health Servs.,* 228 Conn. 651, 670–71, 638 A.2d 6, 19–20 (1994) (psychiatrist's due process rights not violated where proposed decision was drafted by person who conducted evidentiary hearing or read entire record and board members who voted on final decision acquainted themselves with the record sufficiently to exercise informed judgment); *Brock v. Police Bd.,* 205 Ill.App.3d 1035, 1042–43, 563 N.E.2d 970, 976–77 (1990) (due process requirements satisfied when hearing officer takes evidence and decision maker renders findings, so long as decision maker considers evidence justifying findings); *Jerry v. Board of Educ.,* 50 A.D.2d 149, 160, 376 N.Y.S.2d 737, 749 (1975) (due process requirements under formal proceedings required by statute satisfied if ultimate decision maker considered and based determination on legally produced evidence); *with State ex rel. Ormet Corp. v. Industrial Comm'n,* 54 Ohio St.3d 102, 105–06, 561 N.E.2d 920, 924–25 (1990) (per curiam) (due process requirements violated where industrial commissioner participated in vote on claimant's application for permanent total disability benefits absent attending evidentiary hearing or reviewing any transcript or summary of the evidence).

Similarly, here, we think the full Board's consideration and action upon the findings of fact and conclusions of law of the Disability Appeals Committee met the requirements of procedural due process. The full Board's ratification order stated it had reviewed the proposed findings of fact and conclusions of law of the Disability Appeals Committee. In the absence of any showing to the contrary, we must presume the full Board did just that.

The Disability Appeals Committee made detailed findings of fact regarding (1) Gardner's age, (2) length of service, (3) injuries on the job, (4) treatment, and (5) the medical board's findings and determination. The Disability Appeals Committee then made an ultimate finding of fact that Gardner had suffered injuries in the line of duty that had rendered him incapacitated for further performance of duty as a firefighter. There is substantial record evidence to support all of these findings.

In its conclusions of law the Disability Appeals Committee cited sections 411.6(3) and 411.6(5) and concluded that Gardner

has established that he meets the requirements of section 411.6(5) for accidental disability benefits. Despite the City's argument that Gardner suffers from degenerative disc disease, there is substantial evidence that his condition was precipitated by the documented on-the-job injuries. The fact that his complete inability to perform did not immediately follow the injuries in question does not preclude entitlement under the statute.

The Disability Appeals Committee then awarded Gardner accidental disability benefits under Iowa Code chapter 411.

We think the Disability Appeals Committee's decision containing its findings of fact and conclusions of law provided a sufficient basis for the full Board to acquire a "personal understanding" of the evidence supporting the basis for the award of accidental disability retirement benefits. As Davis pointed out, *Morgan* only requires that the deciding officers have a personal understanding of the evidence and is not concerned with *how that understanding is developed.* Administrative Law § 11.03, at 45.

### V. *Disposition.*

There is substantial record evidence that Gardner is entitled to accidental disability

retirement benefits under Iowa Code section 411.6(5). In addition, the City received all the due process it was entitled to. We therefore conclude the district court correctly dismissed the City's petition for a writ of certiorari and affirm its order doing so.

**AFFIRMED.**