Frank BOWERS, Appellant,

v.

**POLK COUNTY BOARD OF SUPERVISORS and Polk County, Iowa, Appellees.**

No. 01–1636.

Supreme Court of Iowa.

Jan. 7, 2002.

Rehearing Denied Feb. 7, 2002.

Bruce E. Johnson of Lewis, Webster, Johnson, Van Winkle & DeVolder, L.L.P., Des Moines, for appellant.

Edward W. Remsburg of Ahlers, Cooney, Dorweiler, Haynie, Smith & Allbee, Des Moines, and John P. Sarcone, County Attorney, and Michael O'Meara, Assistant County Attorney, for appellees.

L.R. Voigts, Stephanie L. Marett, and Jordan B. Hansell of Nyemaster, Goode, Voigts, West, Hansell & O'Brien, P.C., and Mark McCormick and Matthew T. Cronin of Belin, Lamson, McCormick, Zumbach & Flynn, P.C., for amicus curiae Greater Des Moines Partnership.

LAVORATO, Chief Justice.

Frank Bowers appeals from a district court judgment affirming the Polk County Board of Supervisors' decision to authorize the issuance of essential county purpose bonds without holding a public referendum. Bowers contends the statutes at issue, as applied, violate the Iowa constitutional guarantees of equal protection and due process. Because we find no such constitutional violations, we affirm.

## I. Statutory Scheme.

We think a discussion of the statutory scheme at issue would put the facts and proceedings in this case in proper context and aid our discussion of the issues Bowers raises.

In 1981, the Iowa legislature enacted Iowa Code chapter 331, which addresses county home rule implementation. *See* 1981 Iowa Acts ch. 117. `Division IV of the chapter sets forth the powers and duties of the county board of supervisors regarding county finances. Iowa Code section 331.441 defines two types of general obligation bonds, "essential county purpose" bonds and "general county purpose" bonds. Iowa Code § 331.441(2)(b), (c) (2001).

Generally, "essential county purpose" includes, among other things, voting machines, bridges or highways, sewers, public buildings, enlargement and improvement of county hospitals, waterworks, etc. Iowa Code § 331.441(2)(b)(1)-(12). "Essential county purpose" also includes acquisition of a city convention center or veterans memorial auditorium, and carrying out urban renewal projects. Iowa Code § 331.441(2)(b)(13), (14). The bonds in this case are general obligation bonds for an essential county purpose that both Bowers and the Board describe as urban renewal. Section 331.441(2)(b)(14) therefore applies.

In general, essential county purpose bonds are not subject to the possibility of a voter referendum. Iowa Code § 331.443(2). Before the Board may issue bonds for an essential county purpose, it must publish a notice of the proposed action not less than four and not more than twenty days before the date of the meeting at which the board proposes to take action. Iowa Code §§ 331.443(2), 331.305. After considering oral or written objections at the meeting, the board may take additional action to issue the bonds or abandon the proposal to issue them. Iowa Code § 331.443(2). Any resident or property owner of the county may appeal the board's decision to the district court within fifteen days, "but the additional action of the board is final and conclusive unless the court finds that the board exceeded its authority." *Id.*

The procedure is different, however, for essential county purpose bonds to fund urban renewal projects. Such bonds are subject to the "right of petition for an election as provided in section 331.442, subsection 5, without limitation on the amount of the bond issue or the population of the county." Iowa Code § 331.441(2)(b)(14). Additionally, "the board shall include notice of the right of petition in the notice of proposed action required under section 331.443, subsection 2." *Id.*

As section 331.441(2)(b)(14) provides, section 331.442(5) sets forth the right-of-petition procedure for essential county purpose bonds to fund urban renewal projects. At least ten days prior to the meeting at which it proposes to take action, the board must give notice of the proposed action, and include a statement of the right to petition for an election. Iowa Code § 331.442(5)(a). If a petition is filed with the auditor "in the manner provided by section 331.306" at any time before the date fixed for the meeting at which the board proposes to take action, the board shall either by resolution abandon the proposal to issue the bonds or call a special election. Iowa Code § 331.442(5)(b). Section 331.306 provides that such a petition must be "signed by eligible electors of the county equal in number to at least ten percent of the votes cast in the county for the office of the president of the United States or governor at the preceding general election." Iowa Code § 331.306. If the

board calls a special election, at least sixty percent of the total votes cast must be in favor of issuing the bonds. Iowa Code § 331.442(4).

In contrast, the issuance of general county purpose bonds requires a special election. The issuance of such bonds requires a vote in favor of the bond proposal equal to at least sixty percent of the total vote cast for and against the bond proposal. *See* Iowa Code § 331.442(2), (4).

However, no special election is required for general county purpose bonds where the size of the bond issue is small enough when compared with the population of the county. *See* Iowa Code § 331.442(2), (5). In those limited circumstances (e.g., population of 20,000 or less, amount not more than $50,000), the board must give at least ten days' notice of the proposed action and include a statement of the right to petition for an election. Iowa Code § 331.442(5). The petition process is the same as described above. *See* Iowa Code §§ 331.306, 331.442. "General county purpose" means a memorial building or monument, museum, park or recreation area, airport, county public hospital, etc., or "[a]ny other purpose which is necessary for the operation of the county or the health and welfare of its citizens." Iowa Code § 331.441(2)(c).

With this statutory scheme in mind, we proceed to the background facts and proceedings in this case.

## II. Background Facts and Proceedings.

On July 24, 2001, the Polk County Board of Supervisors adopted a resolution fixing the date for a meeting on the proposition to issue, in one or more series, not to exceed $151 million, general obligation bonds for an essential county purpose. The resolution also provided for publishing notice of the proposition. The bonds are to be used to finance the Iowa Events Center, a large arena and exhibit hall in downtown Des Moines, Iowa.

The public notice was published in *The Des Moines Register* on July 26, 2001. The notice stated that the Board would hold a public hearing on August 7, 2001, to take additional action for the issuance of $151 million general obligation bonds for essential county purposes. The notice also stated, "[a]t any time before the date of said meeting, a petition, asking that the question of issuing such bonds be submitted to the legal voters of said County, may be filed with the Auditor of said County in the manner provided by Section 331.306 of the Code of Iowa, pursuant to the provisions of Section 331.442 of the Code of Iowa."

Because the bonds here are to fund an urban renewal project, the Iowa Events Center, their issuance is subject to the right of petition for an election. *See* Iowa Code § 331.441(2)(b)(14). In this case, the Board was required to publish notice at least ten days before the meeting at which it proposed to take action for the issuance of the bonds. *See* Iowa Code § 331.442(5).

As mentioned, a valid petition for an election must contain signatures equal to ten percent of the votes cast in the most recent presidential or gubernatorial election. *See* Iowa Code § 331.306. If the petition is valid, the board may direct the county auditor to call a special election in which sixty percent of the votes cast must be in favor of issuing the bonds. *See* Iowa Code § 331.442(4), (5). Here, 17,417 signatures were required based on the votes cast in the 2000 presidential election.

Bowers began planning a petition drive on July 27. Several ads, reproducing the petition for a referendum, appeared in *The Des Moines Register*, urging citizens to sign the petition. A small group of volun-

teers helped Bowers circulate petitions door-to-door and in public places.

At Bowers's request, the county auditor agreed to keep his office open into the evening on August 6, to accept Bowers's petition. At approximately 9:30 p.m., Bowers delivered a basket of documents containing the petition with signatures of persons requesting a referendum. After an initial count, the auditor determined that Bowers was 576 signatures short. A recount, requested by Bowers, showed he was 619 signatures short. At approximately 11:15 p.m., the auditor refused to accept the petition and returned it together with the signatures to Bowers. *See* Iowa Code § 331.306 (providing that a petition lacking the required number of signatures shall be returned to the petitioners).

The next day—the date set for the public hearing—the auditor appeared before the Board and informed it that Bowers had presented a petition lacking the requisite number of signatures. Bowers appeared before the Board and stated that he had additional signatures. He also said, "I just want you to know that if we had had one more day, you wouldn't have to make this decision. The voters would have made it for you." The Board voted three to two in favor of issuing the bonds.

Bowers appealed the Board's action to the district court pursuant to section 331.443(2), raising several constitutional issues. In his appeal, he named the Polk County Board of Supervisors and Polk County, Iowa (hereinafter collectively the "Board") as defendants. Following a hearing in which the parties presented stipulated testimony and made their respective arguments to the court, the court denied the appeal. The court also denied Bowers's Iowa Rule of Civil Procedure 179(b) motion.

Bowers has appealed to this court, again urging, among other things, the constitutional issues he raised in the district court.

We set out additional facts where relevant to the issues discussed.

## III. Issues.

In the district court, Bowers raised several constitutional claims under the Iowa Constitution. First, he contended that the requirements of the petition process violate the equal protection clause of the Iowa Constitution because they force citizens in more populous counties to obtain a greater number of signatures on a referendum petition. Second, he contended that the petition process violates the due process rights under the Iowa Constitution because it unreasonably limits the ability of citizens to petition the Board for a referendum. The district court noted that Bowers did not explicitly state which type of due process—procedural or substantive—was being violated. So the court addressed both issues.

On appeal, Bowers again raises the constitutional issues he raised in the district court.

## IV. Scope of Review.

We review constitutional issues de novo. *In re Morrow,* 616 N.W.2d 544, 547 (Iowa 2000). Because statutes are cloaked with a strong presumption of constitutionality, a party challenging a statute carries a heavy burden of rebutting this presumption. *Id.* The challenger must show beyond a reasonable doubt that a statute violates the constitution. *Johnston v. Veterans' Plaza Auth.,* 535 N.W.2d 131, 132 (Iowa 1995). Additionally, such party must negate every reasonable basis upon which the statute could be upheld as constitutional. *Morrow,* 616 N.W.2d at 547.

## V. Equal Protection.

### A. Applicable law.

 The Iowa Constitution prohibits laws that "grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms shall not equally belong to all citizens." Iowa Const. Art. I, § 6. We usually deem the federal and state equal protection clauses to be identical in scope, import, and purpose. *Exira Cmty. Sch. Dist. v. State*, 512 N.W.2d 787, 792–93 (Iowa 1994). We therefore apply the same analysis in considering state equal protection claims as we do in considering federal equal protection claims under the Fourteenth Amendment to the Federal Constitution. *Morrow*, 616 N.W.2d at 547; *see also Miller v. Boone County Hosp.*, 394 N.W.2d 776, 778 (Iowa 1986).

 The Equal Protection Clause requires that similarly-situated persons be treated alike. *Morrow*, 616 N.W.2d at 548. "If people are not similarly situated, their dissimilar treatment does not violate equal protection." *Id.*

 Any governmental classification of persons, however, "must meet the applicable constitutional standard imposed under the Equal Protection Clause." *Blumenthal Inv. Trusts v. City of West Des Moines*, 636 N.W.2d 255, 268 (Iowa 2001). Unless a suspect class or a fundamental right is involved, any classification made by the legislature need only have a rational basis. *Id.* As we later discuss, no fundamental right is involved in this case. Nor is a suspect class involved.

 Under the rational basis standard, the classification of persons is constitutional if the classification is a reasonable one and operates equally upon all within the class. *Id.* In addition, we will uphold a classification if we can reasonably conceive any state of facts to justify it. *State v.*

*Bell*, 572 N.W.2d 910, 912 (Iowa 1997). Moreover, under the rational basis standard, a "statute enjoys a presumption of constitutionality which can only be overcome by proof that the law is patently arbitrary and bears no rational relationship to a legitimate governmental interest." *Miller v. Bd. of Med. Exam'rs*, 609 N.W.2d 478, 482 (Iowa 2000).

 A classification is reasonable if it is "based upon some apparent difference in situation or circumstances of the subjects placed within one class or the other which establishes the necessity or propriety of distinction between them." A classification "does not deny equal protection simply because in practice it results in some inequality; practical problems of government permit rough accommodations. . . ." *State v. Mann*, 602 N.W.2d 785, 792 (Iowa 1999) (citation omitted). When a statute involves classification of persons, the legislature has wide discretion in defining the limits of classes. *State v. Hall*, 227 N.W.2d 192, 194 (Iowa 1975).

### B. Analysis.

 Here, Bowers argues that the voters in more populous counties such as Polk County are treated differently from voters in less populous areas. Specifically, Bowers argues the ten-day time limit does not give Polk County voters a reasonably adequate time to gather the required petition signatures. In contrast, he argues, the ten-day requirement is more than adequate for voters in low population counties. He concludes that "[t]here is no reason more than 10 days could not be allowed to all counties so that Polk County would have reasonably adequate time to mount a petition effort."

We think Bowers's argument must fail at the outset. As the district court concluded, "Iowans who reside in counties

with a relatively small population are not similarly situated to those who live in Polk County for purposes of this statute." We agree with the district court that to account for this variance in population is exactly why the legislature enacted the ten percent requirement, a requirement that applies to all counties. As the United States Supreme Court recognized, "[s]ometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike." *Jenness v. Fortson*, 403 U.S. 431, 442, 91 S.Ct. 1970, 1976, 29 L.Ed.2d 554, 562 (1971).

Moreover, we disagree with Bowers's contention that it is more difficult for Polk County voters to obtain the required number of signatures. To the contrary, we think being in a larger populated area likely helped Bowers in many ways. For example, he was able to have copies of the petition published in *The Des Moines Register*, something that a petitioner in a small town with no daily newspaper could not do. He also received free and fortuitous coverage from the *Register* when it reported, on August 6, that the petition might be 8,000 signatures short. According to Bowers, "[t]his elicited an immediate, landside response from people who had not been contacted previously. . . ."

Finally, the recent experience in Scott County further supports our conclusion. Acting under the same statute, Scott County citizens seeking a referendum on the issuance of $5 million in bonds by the county were able to collect approximately 11,200 signatures in six days. They only needed 7,057 signatures based upon the 2000 presidential election turnout. As the United States Supreme Court observed in *American Party of Texas v. White:*

> Hard work and sacrifice by dedicated volunteers are the lifeblood of any political organization. Constitutional adjudication and common sense are not at war

with each other, and we are thus unimpressed with arguments that burdens like those imposed [here] are too onerous, especially where [the requirements were satisfied by other parties].

415 U.S. 767, 787, 94 S.Ct. 1296, 1309, 39 L.Ed.2d 744, 763 (1974) (commenting on statutory requirement regarding collecting sufficient number of signatures to place candidate on ballot).

We agree with the district court that Bowers has failed to prove that the bond referendum statutes treat him differently from other similarly situated persons. Our finding on this issue disposes of Bowers's equal protection claim, and therefore makes it unnecessary for us to address the rational basis prong of the equal protection analysis.

## VI. Due Process

The Iowa Due Process Clause mandates that "no person shall be deprived of life, liberty, or property, without due process of law." Iowa Const. art. 1, § 9. We usually deem the federal and state due process clauses to be identical in scope, import, and purpose. *Exira Cmty. Sch. Dist.*, 512 N.W.2d at 792–93. Courts have interpreted the Due Process Clause to have both "substantive" and "procedural" components and have employed different frameworks of analysis as to each component. *See generally* 16B Am.Jur.2d *Constitutional Law* § 901, at 485–86 (1998).

### A. Procedural due process.

### 1. Applicable law.

A person is entitled to procedural due process when state action threatens to deprive the person of a protected liberty or property interest. *Callender v. Skiles*, 591 N.W.2d 182, 189 (Iowa 1999). Procedural due process requires that before there can be a deprivation of a

protected interest, there must be notice and opportunity to be heard in a proceeding that is "adequate to safeguard the right for which the constitutional protection is invoked." *City of Cedar Rapids v. Mun. Fire & Police Ret. Sys. of Iowa*, 526 N.W.2d 284, 291 (Iowa 1995) (citation omitted).

■■■ Our first inquiry in a procedural due process analysis is whether a protected liberty or property interest is involved. *Callender*, 591 N.W.2d at 189. Liberty interests have as their source, in the first instance, the Federal Constitution and include such things as freedom from bodily restraint, the right to contract, the right to marry and raise children, and the right to worship according to the dictates of a person's conscience. *Bd. of Regents of State Coll. v. Roth*, 408 U.S. 564, 572, 92 S.Ct. 2701, 2706–07, 33 L.Ed.2d 548, 558 (1972). Protected property interests on the other hand "are created and their dimensions are defined" not by the Constitution but by an independent source such as state law. *Movers Warehouse, Inc. v. City of Little Canada*, 71 F.3d 716, 718 (8th Cir.1995) (citation omitted).

■■■ If we determine a protected interest is involved, we next decide what process is constitutionally due by balancing three competing interests:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18, 33 (1976); *see also Owens v. Brownlie*, 610 N.W.2d

860, 870 (Iowa 2000). "No particular procedure violates [due process] merely because another method may seem fairer or wiser." 16B Am.Jur.2d *Constitutional Law* § 909, at 500 (1998).

**2. Analysis.**

■■■ The district court described Bowers's procedural due process claim this way:

The interest asserted by the Plaintiff in this case is atypical of most procedural due process claims. He is not being deprived of a liberty or property interest without a hearing, nor is he arguing that the Board failed to follow procedural guidelines. His attack rests solely on the constitutional legitimacy of the procedure itself.

We too acknowledge that Bowers has not framed his procedural due process claim in the traditional mode of denial of notice and opportunity to be heard. What he seems to be saying is that the referendum procedure was not sufficiently adequate for procedural due process purposes to allow citizens of Polk County, and more specifically himself, to register their objections to the proposed bond issue. Simply put, as he views it, the ten-day time limit was constitutionally too short and the ten percent signature requirement was constitutionally too burdensome.

As mentioned, the first step in our analysis is to determine whether Bowers even had a protected interest. We assume, without deciding, that he did have such an interest by virtue of sections 331.442(5) and 331.306, which define the petition process.

Our next step in the analysis is to determine whether the petition process comports with procedural due process by employing the *Mathews'* three part balancing test.

### a. Private interests.

■ In this step of the analysis we must first identify Bowers's private or protected interest that will be affected by the petition process. We start by noting what that interest is not. It is not a protected interest in the "right to vote" as Bowers argues. The petition process does not prohibit Bowers from exercising his right to vote. "This is *not* a 'right to vote' case; referendums, unlike general elections for a representative form of government, are not constitutionally compelled." *Kelly v. Macon–Bibb County Bd. of Elections*, 608 F.Supp. 1036, 1038 (M.D.Ga.1985). As the court in *Kelly* explained:

> The right to vote in a general election, *i.e.*, the right to participate in *representative* government, is a fundamental constitutional right that may not be abridged absent a compelling state interest. A referendum, however, is a form of direct democracy. Our constitution insures a representative form of government, not a direct democracy. Where a statute provides for an expression of direct democracy, such as by initiative or referendum, it does so as a matter of legislative grace; the right to participate in such a process is not fundamental to our Constitution.

*Id.* at 1038 n. 1; *see also Spaulding v. Illinois Cmty. Coll. Bd.* 64 Ill.2d 449, 1 Ill.Dec. 213, 356 N.E.2d 339, 343 (Ill.1976) (stating that the right to vote in a referendum was "purely a permissive one bestowed by the legislature").

Nor does the petition process deny Bowers's protected interest in political speech, as he argues. The petition process simply provides a mechanical procedure to obtain signatures for referendum purposes. In providing that procedure, the petition process does nothing more than impose nondiscriminatory, content-neutral restrictions on Bowers's ability to use the referendum procedure. The process in no way restricts his ability to communicate with other voters about proposed legislation. *See Taxpayers United For Assessment Cuts v. Austin*, 994 F.2d 291, 297 (6th Cir.1993) (holding that Michigan's petition process for initiating legislation by obtaining signatures from registered voters totaling eight percent of the total vote cast in last gubernatorial election did not violate voters' rights of free speech because initiative system was nondiscriminatory, did not restrict means that voters could use to advocate their proposal, and did not limit speech on the basis of content).

■ The only right Bowers had was what the legislature gave him: the right to petition to obtain the right to vote. *See Murray v. City of St. Louis*, 947 S.W.2d 74, 78 (Mo.Ct.App.1997) ("Voters of a municipality have no inherent right to referendum on municipal legislation; they have only such right to referendum as conferred by statute or charter."). And even if the petition process was successful, such right to vote was not guaranteed. The Board retained the ability to abandon the bond issue if it so chose. *See* Iowa Code § 331.442(5)(b). The petition process was a matter of legislative grace because the legislature did not have to provide the process. *See State v. Cronkhite*, 613 N.W.2d 664, 667 (Iowa 2000) ("To obtain a protectable right a person must have more than an abstract need, desire, or expectation of that right; the individual must, instead, have a legitimate claim to it."). Because the right to initiate legislation is a wholly state-created right, the legislature may constitutionally place nondiscriminatory, content-neutral limitations on the ability to initiate legislation. *Austin*, 994 F.2d at 297. Given all of these characteristics of the petition process, Bowers's right or interest was minimal at best.

### b. Governmental interests.

The district court correctly identified the important governmental interests:

[I]f a valid petition is presented to the county auditor, a county referendum will be called. At this referendum, sixty percent of the votes cast must be in favor of the proposed bond issuance in order for the measure to succeed. This super-majority requirement obviously makes it more difficult for the county to incur debt and gives disproportionate power to the minority. The legislature recognized this shift in power, and the obvious cost of a public election, and sought to temper the opportunity for a referendum with the ten percent petition requirement. This ten percent requirement insures that "the administrative burden and expense of a local referendum will not be invoked absent the legitimate concern of a substantial number of concerned citizens active in the local political process."

The State of Iowa has an important, if not compelling, interest in protecting the integrity, fairness, and efficiency of its election process. [The petition process] winnows out petitions that lack substantial public support from those that spark the interest of the citizenry. The statute spares the counties substantial cost and administrative burden of calling a special election for an unsupported referendum. . . . Because [the bonds here] are for essential purposes, the legislature enacted the ten day/ten percent requirement to ensure that only petitions with adequate public interest will result in a referendum. A less stringent petition requirement would excessively tie the hands of counties seeking to incur debt for essential purposes.

(Citations omitted.) *See Anderson v. Celebrezze,* 460 U.S. 780, 788, 103 S.Ct. 1564, 1569–70, 75 L.Ed.2d 547, 557 (1983) (the state has a strong interest in ensuring that its elections are run fairly and honestly); *Austin,* 994 F.2d at 297 (state has an interest in maintaining the integrity of its referendum process).

### c. Risk of an erroneous deprivation; probable value of added procedural safeguards.

As the Board points out, there is little risk an erroneous deprivation of the private interest will result from the petition process. The record shows that Bowers came very close to obtaining the required number of signatures. In fact, Bowers believed that he had met the requirement when he presented the signatures to the auditor on August 6. He was approximately 600 signatures away from the statutory requirement on that date, meaning that he had collected approximately ninety-six percent of the required signatures over a seven-day period from July 31 to August 6. Bowers admitted he would have had the required amount if he had "one more day."

The record also shows that Bowers began planning a petition drive on July 27, the day after notice was published, but he did not actively begin the petition process until a few days afterwards. If Bowers had taken full advantage of the amount of time given by the Board—approximately eleven days—he may very well have been successful. As the district court noted, "Bowers ignores his own mistakes in failing to submit the required number of signatures, detailed in his stipulated testimony, and blames the statutory requirements instead."

In addition, the recent success of Scott County voters, as previously discussed, demonstrates the statutory scheme is not "unfair" as Bowers suggests. That success illustrates the statutory bar has not been set so high by the Iowa legislature

that it effectively eliminates all elections on bonds like the ones here.

The probable value of additional or substitute procedural safeguards is slight at best. Bowers's near miss, due to his own miscalculations, and the Scott County experience strongly suggest that the probable value of increasing the time for gathering the signatures and lowering the percentage requirement is not significant.

In balancing the foregoing three interests, we believe the scales tip in favor of finding no procedural due process violation. The district court correctly concluded that the referendum statutes provide all the process that is constitutionally due to Bowers.

### B. Substantive due process.

### 1. Applicable law.

■ Substantive due process "forbids the government [from infringing] certain 'fundamental' liberty interests *at all,* no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Reno v. Flores,* 507 U.S. 292, 302, 113 S.Ct. 1439, 1447, 123 L.Ed.2d 1, 16 (1993). Substantive due process analysis must begin with a careful description of the asserted right. *Id.* Narrow tailoring is required only when fundamental rights are involved. *Id.* at 305, 113 S.Ct. at 1448, 123 L.Ed.2d at 18. The impairment of a lesser interest "demands *no more than a 'reasonable fit'* between governmental purpose ... and the means chosen to advance that purpose." *Id.* at 305, 113 S.Ct. at 1448–49, 123 L.Ed.2d at 18.

■ As we recently explained, "[a] substantive due process violation is not easy to prove," as illustrated by the following:

> [The] substantive due process doctrine "does not protect individuals from all governmental actions that infringe liberty or injure property in violation of some law." Rather, substantive due process is reserved for the most egregious governmental abuses against liberty or property rights, abuses that "shock the conscience or otherwise offend ... judicial notions of fairness ... [and that are] offensive to human dignity." With the exception of certain intrusions on an individual's privacy and bodily integrity, the collective conscience of the United States Supreme Court is not easily shocked.

*Blumenthal,* 636 N.W.2d at 265 (citations omitted).

### 2. Analysis.

### a. Fundamental liberty interest.

■ As mentioned, Bowers asserts two fundamental rights were infringed in this case: the right to vote and the right to engage in political speech. In our discussion on procedural due process, we concluded the petition process Bowers challenges here does not infringe either right.

■ We also indicated the right he had was what the legislature had given him: the right to petition for the right to vote, which was not guaranteed because the Board retained the ability to abandon the bond issue if it so chose. We described the right as minimal at best. Additionally, it is extremely doubtful that this right is a protected interest for substantive due process purposes. In any event, assuming this is a constitutionally protected right, it clearly is not a fundamental right.

That brings us to the question of the applicable level of scrutiny.

### b. Applicable level of scrutiny.

■ Because no fundamental right is implicated by the challenged petition process, we must review this statutory scheme

under a lesser level of scrutiny. As mentioned, due process in these circumstances demands no more than a reasonable fit between the governmental purpose and the means chosen to advance that purpose. *Id.*

### c. Applying the level of scrutiny.

■■ At this point of our analysis, we need only determine whether there is a reasonable fit between the governmental purpose and the means used to advance that purpose. We described several governmental purposes or interests in our discussion on procedural due process and how the petition process advances those purposes. That discussion amply supports our conclusion that there is a reasonable fit between those governmental purposes and the means, i.e. the petition process, to advance those purposes.

### VI. Disposition.

In sum, we conclude Bowers has failed to show beyond a reasonable doubt that the statutory petition process violates the Iowa Constitution and to negate every reasonable basis that might support that process. Specifically, he has failed to show an equal protection, procedural due process, or substantive due process violation. Accordingly, we conclude the district court correctly affirmed the conclusion of the Board. Implicit in the district court's affirmance is that the Board did not exceed its authority. We therefore affirm the judgment of the district court.

**AFFIRMED.**

All justices concur except CADY, J., who dissents.

CADY, Justice (dissenting).

I respectfully dissent. Under our law, once an individual is granted a right, any restrictions imposed by the government on the exercise of that right must be fair and reasonable. In this case, I believe it is an unfair and unreasonable restriction on the individual right to petition for a bond referendum to require the petition to be submitted within ten days notice when the government further requires the petition to contain the signatures of, in this case, 17,417 eligible voters in the county. The ten-day restriction makes the exercise of the right illusory, and constitutes a denial of an individual's constitutionally protected right of due process.

Our legislature granted county residents and property owners in Iowa the right to seek a referendum on the issuance of bonds for certain purposes. Consequently, Frank Bowers, as well as any other county resident or property owner in Iowa, has an interest protected by the due process clause of our constitution. The majority correctly identifies this interest, as well as the test to determine if the government restriction on the protected interest offends the notion of due process, but unfortunately misapplies the relevant factors and unfairly minimizes the competing interest of the individual, while misdirecting the interests of the government.

In deciding the nature of the process that is due under the circumstances, we apply a three-part balancing test. *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18, 33 (1976). First, we consider the private interest affected by the government action. *Id.* Second, we balance the risk of erroneous deprivation of this interest under the existing procedure imposed by the government with the probable value of a different or substitute procedure. *Id.* Third, we consider the interest of government, including the fiscal and administrative burdens that the different or substitute procedures would entail. *Id.*

### I. Private Interest.

The majority concludes the individual interest at stake in this case is minimal and entitled to little protection from government interference. It reaches this conclusion by relying upon the general concept that a referendum is contrary to our representative form of government, and therefore only marginally exists in Iowa by legislative grace. This conclusion, however, ignores the history of this state in this area and the bedrock fundamental precept that has developed in our law that the issuance of bonds by local governments for extraordinary purposes requires a vote of the people.

Limits on government spending by the people of Iowa can be traced to 1852. Under our original constitution, the people of Iowa limited the amount that a county or other political or municipal corporation could become indebted. *See* Iowa Const. art. XI, § 3 (indebtedness shall not exceed five percent of the taxable property value within the county or corporation). Moreover, the concept that a local government in Iowa could not spend money for special community projects and buildings without a vote of the people followed by statutory pronouncements. In 1860, our legislature first enacted a statute requiring the public to vote on the expenditure of funds for courthouses and other public buildings. *See* Iowa Code § 312(23) (1860). The concept of a public vote on special projects quickly spread into other areas as we developed as a state. Thus, a host of similar laws followed which required local government to hold an election to decide whether to construct a variety of special projects, ranging from recreational areas to airports. *See id.* § 461 (1873) (public libraries); *id.* §§ 6239, 6241 (1927) (various special public projects); *id.* § 5903.05 (1939) (airports); *id.* § 345.1 (1971) (submission of question of construction of county build-

ings to voters); *id.* § 313A.35 (1971) (toll bridges); *id.* § 111A.6 (1971) (public museums, playgrounds, parks). At the same time, our legislature has continued to respect our representative form of government by giving elected public officials the ability to function independent of a public vote on matters pertaining to the normal, essential expenditure of public funds.

Today, these longstanding concepts have been merged into a single statutory scheme within our county home rule provisions. *See id.* §§ 331.441–.449 (1983). As before, our law continues to distinguish between essential and general county purposes, and requires "a county special election to vote" on the issuance of bonds before instituting "proceedings for the issuance of bonds for a general county purpose...." *Id.* § 331.442(2) (2001). On the other hand, bonds to incur indebtedness for essential county purposes do not require a predicate public vote. *See id.* § 331.443(1), (2). The board must only allow residents to submit objections, but it is free to proceed. *Id.* § 331.443(2). This is the type of legislative scheme that reflects only a minimal private interest. However, this is not the interest at stake in this case.

What we have in our state, and what we have always had, is a system by which our elected public officials generally determine the financial arrangements for the matters relating to the essential government operations, while the right to determine special expenditures is generally reserved to the people. This concept has been carried forward in time from the inception of this state and is clearly distilled today in Iowa Code section 331.442(2), which provides:

2. Before the board may institute proceedings for the issuance of bonds for a general county purpose, it shall call a county special election to vote upon the question of issuing the bonds....

The only wrinkle in this basic longstanding concept is that our legislature has made an exception. It permits the county to issue general county bonds by a majority vote of the board and bypass a public election if a petition is not filed requesting an election. *Id.* § 333.442(5)(c). Thus, this bypass procedure exists only as an exception to the existing right of the people to determine whether to issue bonds for a special project. Clearly, if our legislature wished to minimize the right of the people and change the course of our historical backdrop, it would not have spelled out the general right of the people in section 331.442(2) before enacting a bypass procedure for the county board.

The meaning of this background and history is obvious. The right of the people to petition a county to force a public vote on the issuance of bonds has strong roots in our law and is far from minimal. It is an important right that continues to be recognized today as in our past. Furthermore, the private interest that gave rise to the legislative decision to establish the right is not somehow minimized because it was penned in a statute instead of the constitution. The source of a right may affect the type of process that must be afforded, but it does not diminish the private interest responsible for the right, just as it does not mean the procedural standards attached to a legislative-based right can be unreasonable. Due process at-

taches to the right, regardless of the source of the right.

The private interests affected by the ten-day period at issue in this case are an important check on our local government's power to incur indebtedness. Unlike the minimal private interest in bonds relating to true essential county purposes, the private interest in the bonds in dispute here is substantial. Consequently, I believe there is an important public interest at stake in this case, and there is no basis for the majority to minimize it for the purpose of applying our due process clause.

## II. Risk of Erroneous Deprivation and Value of Additional Safeguards.

The majority concludes the ten-day period poses little risk in depriving an individual of the right to petition because the evidence in this case showed Bowers came very close to obtaining enough signatures within ten days, and additional time to file a petition would not have helped Bowers because he erroneously believed he had enough signatures and prematurely stopped his efforts to obtain additional signatures. They also point to evidence that residents of Scott County successfully petitioned for a bond referendum by timely submitting a petition with 11,200 signatures. This reasoning, however, misses the important inquiry of this factor.[1]

---

**1.** The majority also minimizes the need for procedural protection by declaring there is no right to an election for most essential county purpose bonds. The district court also placed weight on the fact that the particular project in this case fell within the definition of an "essential county purpose."

It is true that the election requirements generally apply only to projects for general county purposes, and do not apply to projects for an "essential county purpose." It is also true that urban renewal projects, as the project in this case has been designated, fall

within the definition of "essential county purpose." Iowa Code § 331.441(2)(b)(14). However, when our legislature amended the definition of "essential county purpose" to include urban renewal projects, it specifically provided that "bonds issued for this purpose [we]re subject to the *right* of petition for an election. . . ." *Id.* (emphasis added). Yet, there is no indication urban renewal projects were designated as an essential county purpose to minimize the right to petition. Instead, it is clear that the urban renewal law primarily addresses slum and blighted areas

Evidence that Bowers fell just short of satisfying the requirements of the ten-day period, or that the residents of Scott County succeeded, does not support a finding that the ten-day period poses little risk in depriving an individual the right to petition. This evidence may be a consideration, but the question under this due process analysis is not whether it is possible to meet the standard imposed by government, but whether the standard imposed possesses a serious risk that the right cannot be reasonably exercised. Bowers' efforts were gargantuan, and there is a huge difference between accumulating 11,-200 votes and 17,417 votes at the local level. It may be easy to criticize Bowers' efforts in hindsight, but the evidence reveals he acted as a model, concerned citizen, and earnestly pursued his right to petition in a conscientious and devoted manner. If the efforts he put forth in this case were insufficient, it is difficult to imagine how any citizen could meet the standard. If a government standard regulating a right is set too high for people to reach, the right involved is no longer a right of the people. Moreover, the test under the due process clause is not whether it is possible to meet the governmental restriction, but whether the right can reasonably be exercised.

The real importance of the evidence showing Bowers fell just short of the time requirements relates to the remaining half of the balancing test. That is, the risk of losing the right to petition must be balanced against the value of an additional or different standard. The evidence in this case shows that an additional five or ten days would have been of great value in permitting the residents of Polk County to exercise their right to petition.

Clearly, the ten-day standard imposed by the statute in this case poses a serious risk to county residents that a petition could only be timely filed under the most extraordinary circumstances. The facts of this case clearly establish this proposition. Moreover, the facts further establish that a few additional days would have likely allowed Bowers to exercise the right. Thus, the interplay between these factors reveals the inadequacy of the standard imposed by the legislature when judged under the due process clause and the facts of this case.

### III. Governmental Interest.

The majority disposes of the governmental interest inquiry by quoting the district court. However, the district court only identified the interests of the government in wanting to make the decision to issue the bonds without an election. Naturally, it would be fiscally and administratively less burdensome for the government not to hold an election. Yet, that could be true for most individual rights recognized in this country. Nevertheless, the burden on the government associated with the exercise of a right does not become a standard for the deprivation of rights. The point of this inquiry is not to criticize the right at issue, but to determine if additional procedural requirements relating to the exercise of the right would place onerous fiscal and administrative burdens on the

---

of a municipality which present a serious and growing menace to the city. *See id.* § 403.2(1). The urban renewal law looks to rebuild blighted areas and provide better housing and economic opportunities for people. *See id.* § 403.2(3). Yet, it can also be used, as in this case, as a means of general economic development for a community. *See id.* Thus, while the central concept of urban renewal focuses on essential county purposes, it is broad enough to extend into the area of general county purposes. *See id.* § 331.441(2)(c)(11). It is likely that the broad nature of urban renewal caused the legislature to treat it as a general county obligation for the purposes of the election requirements.

government. Clearly, in this case, five or ten additional days to allow residents to exercise their right to petition would not impose any substantial burden on the government or delay the project in any significant manner.

In adopting the district court reasoning, the majority seems to acknowledge that the ten-day period is needed so the county will not be burdened with elections each time it wants to issue bonds for a project which entitles the public to exercise its right to petition for an election. Yet, that is a burden the government must accept, and the inquiry is to consider the government's need for restrictions. The need for the government to place a time limit on the filing of a petition is undeniable, but the need would be met by a twenty-day restriction just as it is met by a ten-day restriction. A longer time requirement would not adversely impact the governmental need for the time restriction, but it would go a long way to helping citizens to meaningfully exercise their right to petition.

The government interest in eliminating the need for a public election before issuing general obligation bonds is met by the legislative requirement that the petition contain a sufficient number of signatures to show interest and support of the people to justify the time and expense of an election. The ten percent requirement is reasonable and reflects the concept that enough interest exists in the issue to justify the burdens and expenses of an election. However, the ten-day requirement for filing the petition has no additional relationship to this purpose, and only serves to essentially eliminate the right to petition. The due process clause exists to safeguard against the deprivation of rights by all types of government action. *See Lane v. Wilson,* 307 U.S. 268, 275–76, 59 S.Ct. 872, 876, 83 L.Ed. 1281, 1287–88 (1939) (a

twelve-day time period imposed by state statute to allow disenfranchised blacks to register to vote violates the Fifteenth Amendment, which is applied to protect citizens against "sophisticated as well as simple-minded modes of discrimination").

## IV. Conclusion.

The ten-day requirement fails to give the residents and property owners of Polk County a meaningful opportunity to exercise their right to petition. The requirement transforms the petitioning process into a Sisyphean task and violates the due process clause of our constitution. The Events Center may be a very worthwhile project, but it does not justify the deprivation of the due process rights of our citizens.