CHRISTENSEN, Justice (concurring in part and dissenting in part).
 

 I agree with the majority's holding that the juvenile court did not abuse its discretion in denying the mother's motion for continuance. I also agree this court should vacate the decision of the court of appeals, reverse the decision of the juvenile court, and remand the case for an expedited hearing. But, I cannot agree to the majority's onerous mandates for juvenile court judges and their effects on court reporters. As a matter of sound judicial administration, incarcerated parents generally should be permitted to participate by phone in the entire termination hearing as long as it is arranged by the parent's attorney and allowed by prison officials. Contrary to the majority's holding, failure to do so in this case was simply a lack of sound judicial administration, not a matter of constitutional due process. This case is about what is in the best interest of a child and achieving permanency. However, the majority unduly favors incarcerated parents by creating new, unwarranted burdens on the juvenile courts that will impede the paramount goal of protecting the best interests of children who so desperately need a permanent home.
 

 I. Error Preservation.
 
 First, we should not decide an important constitutional matter on appeal when the mother failed to preserve her due process argument for appeal. By ignoring our error preservation rules, the majority is reversing the juvenile court for failing to credit an argument that the mother never made. While the mother did move to continue and appear by telephone, she did not raise due process arguments in juvenile court or her petition for appeal. The motion argues that "it would be unfair and unjust to hold a hearing regarding the placement" without her presence, but that is the closest the record comes to any form of due process argument. It is not close enough.
 
 See
 

 Meier v. Senecaut
 
 ,
 
 641 N.W.2d 532
 
 , 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal."). Due process claims obviously implicate constitutional issues, but neither the petition on appeal nor application for further review so much as cites the due process provision of the Iowa Constitution or the United States Constitution. Therefore, I would not leap to either constitution to decide this issue on constitutional grounds.
 

 II. Procedural Due Process.
 
 Second, the juvenile court did not deprive the mother of her due process rights. The United States Constitution and the Iowa Constitution both provide Iowans with due process protections so that the state shall not "deprive any person of life, liberty, or property without due process of law."
 

 U.S. Const. amend. XIV, § 1 ;
 
 see
 
 Iowa Const. art. I, § 9. Procedural due process mandates "notice and opportunity to be heard in a proceeding that is 'adequate to safeguard the right for which the constitutional protection is invoked,' " before the government can deprive anyone of a protected interest.
 
 In re C.M.
 
 ,
 
 652 N.W.2d 204
 
 , 211 (Iowa 2002) (quoting
 
 Bowers v. Polk Cty. Bd. of Supervisors
 
 ,
 
 638 N.W.2d 682
 
 , 691 (Iowa 2002) ).
 

 In the past, we have recognized that termination proceedings "threaten[ ] to deprive the [parent] of [a] liberty interest in the care, custody, and control of [his or] her child."
 
 Id.
 
 at 211. Given the protected interest implicated in termination proceedings, we balance three competing interests to determine the constitutional requisites of the procedure.
 
 Id.
 
 at 212. These interests are
 

 (1) the private interest affected by the proceeding; (2) the risk of error created by the procedures used, and the ability to avoid such error through additional or different procedural safeguards; and (3) the countervailing governmental interests supporting use of the challenged procedures.
 

 Id.
 

 We examined these competing interests involved in termination proceedings in
 
 In re C.M.
 
 , in which we held that a parent's due process rights were not violated when the parent was limited to raising her claims of error on appeal in a petition rather than in a brief.
 
 Id.
 
 at 207, 211-12. In doing so, we noted the importance of the presence of counsel as a safeguard for the parent's due process rights.
 
 Id.
 
 at 212. Regarding the first factor, we concluded, "A parent has an interest in the custody of his or her child."
 
 Id.
 
 Regarding the third factor, we explained that it is in the state's interest to finalize the termination expediently "so as to meet the child's emotional and psychological need for a permanent home, as well as to control the financial drain on the State caused by needlessly protracted proceedings."
 
 Id.
 
 We also found the parent has an interest "in a speedy conclusion because of the potential of regaining custody."
 
 Id.
 
 Despite these competing interests, we cannot forget the paramount interest in termination proceedings is always the best interests of the child.
 
 See, e.g.
 
 ,
 
 In re J.C.
 
 ,
 
 857 N.W.2d 495
 
 , 500 (Iowa 2014) ;
 
 see also
 

 Iowa Code § 232.1
 
 (2017) ("This chapter shall be liberally construed to the end that each child under the jurisdiction of the court shall receive, preferably in the child's own home, the care, guidance and control that will best serve the child's welfare and the best interest of the state.").
 

 This case hinges on the second factor, which is "the risk of error created by the procedures used, and the ability to avoid such error through additional or different procedural safeguards."
 
 In re C.M.
 
 ,
 
 652 N.W.2d at 212
 
 . We have previously held that "[b]iological parents have a due process right to notice and a hearing before termination of their parental rights may occur."
 
 In re J.C.
 
 ,
 
 857 N.W.2d at 506
 
 . This requirement "serves the best interests of the child by ensuring that subsequent placements are not later upset, to the detriment of the child."
 

 Id.
 

 at 507
 
 . Nevertheless, a parent's right to notice and hearing does not mean the parent has a due process right to attend the termination hearing.
 
 Cf.
 

 Webb v. State
 
 ,
 
 555 N.W.2d 824
 
 , 826 (Iowa 1996) (per curiam) (citing
 
 In re J.S.
 
 ,
 
 470 N.W.2d 48
 
 , 52 (Iowa Ct. App. 1991) ).
 

 A termination of parental rights (TPR) proceeding is a civil matter.
 
 In re D.J.R.
 
 ,
 
 454 N.W.2d 838
 
 , 846 (Iowa 1990). In
 
 In re J.S.
 
 , a father argued the juvenile court violated his due process rights when it denied his request to be transported from prison to attend the termination hearing in
 person, claiming he had the "right to know the charges, allegations, and evidence presented against him, as well as a right to have the State present its case first."
 
 470 N.W.2d at 51
 
 . The parent's counsel attended the hearing, and the parent's testimony was presented by deposition.
 

 Id.
 

 The court of appeals concluded in a published opinion that a parent is not "deprived of fundamental fairness" so long as the "parent receives notice of the petition and hearing, is represented by counsel, counsel is present at the termination hearing, and the parent has an opportunity to present testimony by deposition."
 

 Id.
 

 at 52
 
 . In reaching this conclusion, the court of appeals noted the parent "mistakenly assert[ed] [S]ixth [A]mendment rights granted to a criminal defendant in a criminal case. The termination of parental rights is a civil case."
 

 Id.
 

 at 51-52
 
 .
 

 In
 
 Webb
 
 , we cited
 
 In re J.S.
 
 to support our holding that a defendant's due process rights "did not include attendance at the [postconviction-relief] hearing."
 
 555 N.W.2d 824
 
 , 826 (Iowa 1996). In
 
 Webb
 
 , the defendant seeking postconviction relief received notice of the hearing and telephone conference, was represented at the hearing by counsel, and was provided the opportunity to present his testimony by telephone.
 

 Id.
 

 at 826
 
 . We determined these safeguards adequately "accorded the fundamental fairness due to him."
 

 Id.
 

 (citing
 
 In re J.S.
 
 ,
 
 470 N.W.2d at
 
 52 ).
 

 In this matter, similar to the father in
 
 In re J.S.
 
 and the defendant in
 
 Webb
 
 , the juvenile court provided the mother with procedural safeguards necessary to afford her fundamental fairness to protect against the risk of erroneous deprivation of her parental rights. Although the mother did not participate telephonically for the entirety of the hearing, her attorney was present on her behalf for the entirety. Moreover, much of the evidence presented against the mother was well documented due to her criminal charges and record, as well as her past interactions with the department of human services due to the children's child-in-need-of-assistance (CINA) adjudications. At the termination hearing, the State asked the juvenile court to take judicial notice of many of the same exhibits used in the CINA adjudications. Thus, not only did the mother have access to the CINA transcripts, but she also had access to the CINA exhibits, which were the same exhibits used in her termination hearing. The mother was aware of the claims being made against her, and many of the facts she disputes on appeal boil down to credibility determinations the juvenile court was within its discretion to make.
 

 At the time the juvenile court issued its TPR order in May, the mother in this case was facing several criminal charges in the State of South Dakota, including (1) possession of a controlled substance with intent to deliver (class 3 felony), (2) possession of a controlled substance (class 5 felony), (3) three counts of possession of drug paraphernalia (class 2 misdemeanor), (4) possession with intent to deliver a controlled substance-methamphetamine (class 4 felony), (5) two counts of possession of a controlled substance-methamphetamine (class 5 felony), (6) possession of a controlled substance-clonazepam/klonopin (class 6 felony), (7) distribution of a controlled substance-methamphetamine (class 4 felony), (8) unauthorized ingestion of a controlled substance-methamphetamine (class 5 felony), (9) ingesting marijuana (class 1 misdemeanor), and (10) possession of two ounces or less of marijuana (class 1 misdemeanor). She also pled guilty to conspiracy to manufacture in the State of Iowa, a class C felony, and served time in prison from 2008 to 2010.
 

 The mother's failure to maintain a meaningful and significant relationship with the children is a further indicator of her inability to prioritize what is in their best interest. She had not had any authorized contact with her children in the five months preceding her termination and stopped visiting the children on her own prior to her arrest, though she did text M.D. from jail. M.D. subsequently attempted suicide and explained that her mother's text messages contributed to her suicide attempt.
 

 The evidence shows the other children have also sustained significant emotional harm related to contact with their mother, as K.T., G.A., and E.A. have all participated in therapy to address behavioral concerns. K.T. has reported struggles with her emotions regarding her mother, and G.A.'s negative behaviors increased when her mother stopped visiting in January 2018. The only child who was not undergoing therapy at the time of the TPR hearing was S.A., who was less than two years old at the time.
 

 The mother has failed to address her substance abuse issues and other mental health issues by refusing services offered to her to treat these issues. Though the mother claimed to have been sober for sixty days at her TPR hearing, she was also incarcerated during this time. There is a significant difference between remaining sober in the structured, monitored prison setting and maintaining sobriety outside of prison.
 

 She previously had her parental rights terminated to two other children due in large part to her substance abuse. The evidence also shows the mother engaged in drug use and criminal activity before the children in this case were removed from her care, and she exposed at least some of these children to the various men she was using drugs with before the children's removal from her care. Nevertheless, the mother continues to deny her role in the abuse, claiming the children's emotional trauma is the result of her inability to be with them.
 
 See
 

 In re L.H.
 
 ,
 
 904 N.W.2d 145
 
 , 153 (Iowa 2017) ("An important aspect of a parent's care for his or her child is to address his or her role in the abuse of the child.").
 

 Moreover, the mother continued to maintain unhealthy relationships with a number of men involved with drugs in the past while the CINA adjudication was pending in this case. Since 2015, she has relapsed with five different men. She began a relationship with one of these men in December 2017 and married him the month before the TPR hearing.
 

 Notably, once the children were removed from the mother's care, all of them were placed with their respective biological fathers in stable homes. The fathers continue to participate in services to assist their children in receiving the treatment they need, and they have been working together to ensure the children spend quality time together as siblings. The juvenile court correctly found that these placements were in the best interests of the children and that clear and convincing evidence supported terminating the mother's rights.
 
 See
 

 In re D.W.
 
 ,
 
 791 N.W.2d 703
 
 , 706 (Iowa 2010) ("We will uphold an order terminating parental rights if there is clear and convincing evidence of grounds for termination under Iowa Code section 232.116. Evidence is 'clear and convincing' when there are no 'serious or substantial doubts as to the correctness or conclusions of law drawn from the evidence.' " (quoting
 
 In re C.B.
 
 ,
 
 611 N.W.2d 489
 
 , 492 (Iowa 2000) ) ).
 

 The majority's holding that the juvenile court violated the mother's due process rights because due process "give[s] incarcerated parents the opportunity to participate from the prison facility in the entire
 [termination] hearing" goes too far and ignores settled law that has been followed for decades in termination proceedings. The majority's decision that mandatory participation in the entire hearing provides the parent with the opportunity to "recall witnesses who testifi[ed] for the state for additional cross-examination and to present other testimony and documentary evidence at the hearing," conflates the rights granted to a criminal defendant with those afforded to a parent in a civil termination hearing. Not only does this threaten the validity of
 
 Webb
 
 , but the majority's decision to provide parents with heightened due process rights in civil termination hearings also calls into question the validity of our juvenile rules of procedure.
 

 Generally, the juvenile court operates under less strict procedural rules than other courts. "The tasks of the juvenile court and the procedures developed are somewhat akin to the tasks and procedures developed in administrative law."
 
 In re Delaney
 
 ,
 
 185 N.W.2d 726
 
 , 737 (Iowa 1971) (Becker, J., concurring specially). For example, rule 8.19 of our juvenile rules allows the use of hearsay evidence "in whole or in part" in child-in-need-of-assistance and termination proceedings as long as "there is a substantial basis for believing the source of the hearsay to be credible and for believing the information furnished." Iowa Ct. R. 8.19 ;
 
 see also
 

 Iowa Code § 232.96
 
 (4)-(6). However, the majority's decision to transform the termination hearing procedures from civil to quasi-criminal and prioritize the rights of a parent over the best interest of a child serves only to thwart this court's commitment to putting the welfare of Iowa's children first.
 

 A number of courts provide juvenile court judges with discretion on this issue, "while finding that representation by counsel and the opportunity to appear via deposition are the two key components required in a due process analysis of a parent who is not in attendance at a proceeding" to terminate parental rights.
 
 In re Involuntary Termination of Parent-Child Relationship of C.G.
 
 ,
 
 954 N.E.2d 910
 
 , 921-22 (Ind. 2011) (surveying the procedural due process requirements of other states with regard to a parent's presence at a termination hearing). Other states that have departed from this procedure to enhance the rights of parents have at least provided guidance to aid juvenile courts in their determination of whether a parent's attendance is allowed at the entire termination hearing. For example, the Supreme Court of Nebraska provides the juvenile court with discretion on this issue but requires the juvenile court to make its determination after considering the following factors:
 

 the delay resulting from prospective parental attendance, the need for disposition of the proceeding within the immediate future, the elapsed time during which the proceeding has been pending before the juvenile court, the expense to the State if the State will be required to provide transportation for the parent, the inconvenience or detriment to parties or witnesses, the potential danger or security risk which may occur as a result of the parent's release from custody or confinement to attend the hearing, the reasonable availability of the parent's testimony through a means other than parental attendance at the hearing, and the best interests of the parent's child or children in reference to the parent's prospective physical attendance at the termination hearing.
 

 In re L.V.
 
 ,
 
 240 Neb. 404
 
 ,
 
 482 N.W.2d 250
 
 , 258-59 (1992). Not only is Nebraska in the same federal circuit as us, but it also has similar statutes governing children in need of assistance and the termination of parental rights.
 
 Compare
 

 Neb. Rev. Stat. Ann. § 43-283
 
 (West, Westlaw through 2d Reg.
 

 Sess. of the 105th Leg. (2018) ),
 
 with
 
 Iowa Code § 600A.7.
 

 The majority points to a case in Delaware as an example in support of its position that incarcerated parents should be afforded the opportunity to participate in the entire termination hearing by telephone from prison.
 
 See, e.g.
 
 ,
 
 Orville v. Div. of Family Servs.
 
 ,
 
 759 A.2d 595
 
 , 599 (Del. 2000). However, the majority should not rely on the Delaware court's interpretation of Delaware's statutes when they are fundamentally different from Iowa's statutes on the termination of parental rights. For example, when a child in Delaware has attained the age of one year, notice of termination must be given to every alleged father, whether or not he has registered with the Office of Vital Statistics.
 
 Del. Code Ann. tit. 13, § 8-405
 
 (West, Westlaw through 81 Laws 2018, chs. 200-453). On the other hand, when a child has not attained the age of one year, the Delaware Code allows for the termination of parental rights "of a man who may be the father of a child" without notice if "[t]he man did not register timely with the Office of Vital Statistics; and [t]he man is not exempt from registration under § 8-402."
 
 Del. Code Ann. tit. 13, § 8-404
 
 .
 

 In contrast, Iowa does not treat the father of a six-month-old child any differently than the father of a six-year-old child. They are going to both receive notice of termination proceedings. Perhaps
 
 Orville
 
 requires telephonic participation for the entire termination hearing to make up for other procedural shortcomings such as notice. Overall, whatever the reason, Iowa does not need to have such a hard-and-fast rule. We have procedural safeguards in our CINA and TPR statutes to adequately accord fundamental fairness to parents.
 
 See, e.g.
 
 ,
 
 Iowa Code § 232.88
 
 (requiring reasonable notice be provided to parents, guardians, and legal custodians when a CINA petition has been filed);
 

 id.
 

 § 232.89 (providing the parent, guardian, or custodian identified in the CINA petition with a right to counsel for all CINA hearings and proceedings);
 

 id.
 

 § 232.113 (providing the parent identified in a TPR petition with the right to counsel for all TPR hearings and proceedings);
 

 id.
 

 § 232.112(1) (entitling parents, guardians, and legal custodians to receive notice of TPR proceedings).
 

 Notably, Iowa law authorizes the juvenile court to temporarily excuse the presence of a parent "when the court deems it in the best interests of the child."
 

 Id.
 

 § 232.38(2). This confirms that the best interests of the child ought to prevail in the event of any conflict with a parent's asserted right of attendance. Does the majority believe this statute is unconstitutional?
 

 Finally, the majority's holding is detached from reality, as it creates substantial practical problems and provides no guidance to resolve them. For example, termination hearings often times take several days to complete and involve numerous witnesses and voluminous exhibits to review. The Iowa Department of Corrections (DOC) is a state agency that operates within the executive branch of the government. Yet, the majority expects juvenile court judges to exert authority over the DOC's prison facilities by directing the facilities to divert their resources to ensure an incarcerated parent participates in the entire hearing by telephone or a similar means of communication. The problems merely increase if the parent is in federal prison. Despite the majority's emphasis on the ability of judicial leadership to persuade out-of-state correctional officials to make the parent available for the entire hearing, even the best leadership from juvenile judges may not be enough to ensure this cooperation.
 

 In those situations when arrangements cannot be made for an incarcerated parent to participate in the hearing, the majority mandates juvenile courts to order an expedited transcript of those portions of the hearing that the parent could not attend prior to testifying by telephone, along with all exhibits in evidence. The cost of a several-day transcript is certainly significant. Requiring court reporters to expedite a several-day trial even more than what is expected in an already expedited proceeding is unrealistic.
 
 [4]
 

 Significantly, attorneys for parents routinely have to prepare their petitions on appeal without the benefit of a transcript. We have approved that procedure recognizing the importance of the expedited deadlines for processing juvenile cases.
 
 See
 

 In re L.M.
 
 ,
 
 654 N.W.2d 502
 
 , 506 (Iowa 2002). It is not realistic to put chapter 232 procedures on hold while transcripts are prepared.
 

 The majority seems to turn a blind eye to the overarching directive of Iowa Code chapter 232 to achieve permanency for the child in a timely fashion and to always place the child's best interest first. The majority must be reminded that this is a
 
 child welfare
 
 proceeding-the termination of a parent's rights happens to be the vehicle by which a child's permanency is achieved when reunification has not been successful. An incarcerated parent's procedural due process rights cannot hinder the timely permanency for a child, and they cannot trump what is in the best interest of a child.
 

 The facts in termination proceedings change frequently. This is especially the case when the juvenile court is dealing with parents who have a severe substance-related disorder and frequently participate in drug testing throughout the course of their termination proceedings. Even a delay of a few weeks could require the state to come back after it presented its case before the delay and present more evidence. This risks getting into a timely back-and-forth presentation of evidence between the parties that only delays the proceedings to the detriment of the children involved.
 
 [5]
 

 In any event, if the majority is going to require an incarcerated parent's telephonic attendance through the entire termination hearing, the burden should be on the parent's attorney-not the presiding judge-to see that the parent's right to attend the hearing is being fulfilled. This aligns with our court-approved standards of practice for attorneys representing parents in juvenile court. Specifically, our standards include the following: "Take reasonable steps to communicate with incarcerated clients and to locate clients who become absent. Develop representation strategies. Establish a plan for the client's participation in case-related events." Iowa Ct. R. 61(10). These standards also acknowledge the issues an incarcerated parent's participation raises and explains, "[T]he attorney
 should make arrangements with the incarcerated client's prison counselor to have the parent appear by telephone" if the parent wishes to participate in the hearing.
 

 Id.
 

 r. 61(10) cmt. [5].
 

 If the prison facility is unwilling to make accommodations for the client to participate telephonically, or if the client is ineligible for telephonic participation because of behavior infractions while incarcerated, then the attorney should make a record of such barriers so that the juvenile court has an opportunity to address them accordingly. Nevertheless, it is unrealistic and improper to expect a juvenile court judge to use his or her judicial authority to advocate for arrangements to be made for an incarcerated parent to participate in the entire telephone hearing by telephone. It is the attorney's responsibility-not the court's-to make arrangements for meaningful participation in court hearings.
 

 Further, the court's decision is certainly creating a slippery slope. It provides incarcerated parents with greater due process rights than nonincarcerated parents. While the majority expects our juvenile courts to make special arrangements and exceptions to accommodate the needs of incarcerated parents so they can be telephonically present for the entire termination hearing, it ignores the needs of nonincarcerated parents. What happens when a nonincarcerated father is unable to attend the termination hearing because his employer will not provide him with time off work?
 
 [6]
 
 Is the juvenile court judge now expected to contact the father's employer and throw his or her weight around in an effort to excuse the parent's absence from work to attend the termination hearing? Similarly, what happens when the case involves a parent who is incarcerated and another parent who is not incarcerated and the juvenile court cannot accommodate both the prison facility's schedule and that of the nonincarcerated parent?
 

 Will this case provide legal authority for an incarcerated parent to demand the same services by a district court judge and court reporter in a dissolution, child custody, or paternity action?
 
 [7]
 
 If the majority is saying that an incarcerated parent in a civil matter is entitled to a judge becoming actively involved in making telephonic arrangements or, in the alternative, ordering an expedited transcript for the entire hearing, then it is not a stretch to answer that question with a yes.
 

 Overall, I agree that the preferable practice in termination proceedings is to allow the parent to participate telephonically for the entire termination proceeding
 if allowed by prison officials. Absent juvenile court findings to support its decision not to allow the parent to participate telephonically for the entire termination hearing-findings that do not exist in this case-the juvenile court should have allowed the mother in this case to participate telephonically for the entire termination as a matter of sound judicial administration. My agreement to remand notwithstanding, the majority's decision to remand this case to the juvenile court should have stemmed from our supervisory authority rather than a constitutional mandate.
 

 This court has inherent supervisory authority to direct the procedures to be followed in Iowa courts, and "our cases have consistently recognized the inherent common-law power of the courts to adopt rules for the management of cases on their dockets in the absence of statute."
 
 Iowa Civil Liberties Union v. Critelli
 
 ,
 
 244 N.W.2d 564
 
 , 568-69 (Iowa 1976) ;
 
 see also
 
 Iowa Const. art. V, § 4 (stating that the supreme court "shall exercise a supervisory and administrative control over all inferior judicial tribunals throughout the state"). This allows us to order what is best without constitutionalizing the matter. For example, we have used our supervisory authority to adopt the Pew Commission report that discussed "Fostering Judicial Leadership" and recommended "that courts use best practice approaches" to better "the lives of children in foster care and their families." Pew Comm'n,
 
 Progress on Court Reforms: Implementation of Recommendations from the Pew Commission on Children in Foster Care
 
 4, 10 (2009), https://www.pewtrusts.org/-/media/legacy/uploadedfiles/phg/content_level_pages/reports/kawcourtsassessmentoctober2009pdf. pdf;
 
 see
 
 Iowa Supreme Ct. Resolution,
 
 In Support of the Recommendations of the Pew Commission on Children in Foster Care
 
 (Sept. 10, 2007). We have also regularly exercised our inherent authority to allow delayed appeals in criminal cases where the defendant can document that he or she attempted to initiate an appeal before the deadline, without ever finding that a due process violation actually occurred. This is done "to prevent unnecessary challenges," and on the theory that a valid due process argument "might" be advanced.
 
 See
 

 Swanson v. State
 
 ,
 
 406 N.W.2d 792
 
 , 793 (Iowa 1987). We have also "exercised our supervisory authority over the rules of procedure and evidence to prohibit the use of unstipulated polygraph examinations in Iowa courts," although this holding "was not based on due process grounds."
 
 See
 

 Dykstra v. Iowa Dist. Ct.
 
 ,
 
 783 N.W.2d 473
 
 , 485 (Iowa 2010).
 

 Instead of following settled law or using our supervisory authority to provide procedural direction, the majority throws a stick of dynamite into the juvenile court system by adopting a hard and fast approach holding incarcerated parents are entitled to participate telephonically for the entire termination hearing or, in the alternative, delaying the child's permanency by stopping the trial so that expedited full transcripts can be prepared. The majority is altering the constitutional landscape in our state based on an unpreserved constitutional claim without providing a cogent analysis of controlling constitutional precedent. "No particular procedure violates [due process] merely because another method may seem fairer or wiser."
 
 In re C.M.
 
 ,
 
 652 N.W.2d at 212
 
 (alteration in original) (quoting
 
 Bowers
 
 ,
 
 638 N.W.2d at
 
 691 ). Yet, this appears to be the basis for the majority's holding today. For these reasons, I concur in part and dissent in part.
 

 Waterman and Mansfield, JJ., join this concurrence in part and dissent in part.
 

 Iowa is already experiencing a significant shortage of official court reporters.
 
 See, e.g.
 
 , Iowa Judicial Branch FY 19 Budget Request, https://www.iowacourts.gov/static/media/cms/2019_budgetrevenues_76551E67392EF.pdf ("There are 6 court reporter positions that have been vacant for over one year and 12 total current court reporter vacancies.").
 

 It also represents a step backward from the vision and principles adopted by the Child Welfare Advisory Committee and Children's Justice State Council, which emphasize the urgency required to provide children with permanency.
 
 See
 
 Children's Justice State Council & Iowa Dep't of Human Servs., Child Welfare Advisory Comm.,
 
 Iowa's Blueprint for Forever Families
 
 1 (2011), https://idph.iowa.gov/Portals/1/Files/SubstanceAbuse/forever_families.pdf ("Permanence is treated with a sense of urgency as if the child were our own or a child of a family member.").
 

 In Iowa, an employee who appears as a witness in obedience to a subpoena "in any public or private litigation
 
 in which the employee is not a party to the proceedings
 
 " is "entitled to time off during regularly scheduled work hours with regular compensation, provided the employee gives to the appointing authority any payments received for court appearance or jury service, other than reimbursement for necessary travel or personal expenses."
 
 Iowa Admin. Code r. 11-63.12
 
 (emphasis added). However, this rule does not require employers to provide employees with time off and compensation to appear in obedience to a subpoena in a civil proceeding in which the employee is a party to the proceedings. Thus, even the power of a subpoena is not enough to prevent a nonincarcerated parent from being penalized at work for time off resulting from the parent's obedience to a subpoena to attend a TPR hearing.
 

 Cf.
 

 Troxel v. Granville
 
 ,
 
 530 U.S. 57
 
 , 66,
 
 120 S.Ct. 2054
 
 , 2060,
 
 147 L.Ed.2d 49
 
 (2000) ("[W]e have recognized the fundamental right of parents to make decisions concerning the care, custody, and control of their children. In light of this extensive precedent, it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." (Citations omitted.) ).